Palmer K. SCHREIBER

v.

Christopher G. KELLOGG.

Civil A. No. 90–5806.

United States District Court,
E.D. Pennsylvania.

April 11, 1996.

Stanley R. Wolfe, Stuart J. Guber, Berger & Montague, Philadelphia, PA, for plaintiff.

Gavin P. Lentz, Philadelphia, PA, for Kellogg.

John E. Caruso, Philadelphia, PA, for Trustees.

**562**

### *MEMORANDUM*

BARTLE, District Judge.

We have before us the question whether plaintiff Palmer K. Schreiber ("Schreiber") may reach the interest of defendant Christopher G. Kellogg ("Kellogg") in a Pennsylvania spendthrift trust to satisfy a judgment entered against him in this court. Kellogg is currently the debtor in a Chapter 7 bankruptcy proceeding in the Southern District of Florida.

This diversity case, now almost six years old, has a long and complex history. On August 3, 1993, after a non-jury trial, this court entered judgment in the amount of $512,863.76 in favor of Schreiber, an attorney, and against Kellogg, his client, for breach of an agreement to pay for legal services Schreiber had performed for Kellogg.[1] These services had been incurred in connection with a surcharge action Schreiber had instituted in 1978 on behalf of Kellogg in the Orphans' Court Division of the Court of Common Pleas of Montgomery County, Pennsylvania. That action alleged a breach of fiduciary duty against the trustees of a sizeable trust created under the will of Kellogg's great grandfather, Rodman Wanamaker. At the time, Kellogg was a contingent beneficiary. The surcharge action was ultimately settled, with the approval of Judge Alfred Taxis of the Orphans' Court, on July 14, 1981. In 1989, some eight years later, upon the death of his mother, Kellogg became an income beneficiary of the Wanamaker trust.[2]

The Court of Appeals affirmed this court's entry of judgment in favor of Schreiber. *Schreiber v. Kellogg,* 37 F.3d 1488 (3d Cir. 1994). As it has turned out, the battle between the parties had only just begun. Both before and after the appeal, Schreiber has been engaged in a vigorous effort to collect the judgment in several jurisdictions. Kellogg has resisted with equal fervor. *See, e.g., Schreiber v. Kellogg,* 839 F.Supp. 1157 (E.D.Pa.1993).

Among other efforts, Schreiber has sought to attach and obtain satisfaction from Kellogg's interest in the Wanamaker trust. This court ruled in 1994, however, that Rodman Wanamaker had created a spendthrift trust so that the assets could not be reached to satisfy the debt of a beneficiary.[3] We also predicted that the Pennsylvania Supreme Court would not adopt § 157(c) of the Restatement (Second) of Trusts. That section provides that an interest of a beneficiary of a spendthrift trust can be reached "for services rendered ... which preserve or benefit the interest of the beneficiary." While the Court of Appeals affirmed our ruling as to the spendthrift nature of the trust, it reversed our prediction of Pennsylvania law with respect to § 157(c). It remanded the case for a determination whether the surcharge action [in the Orphans' Court] "*actually* preserved or benefit[ted] Kellogg's interest in the trust." [emphasis added]. The Court of Appeals made it clear that "a good faith attempt to preserve or benefit the trust" is not enough. *Schreiber v. Kellogg,* 50 F.3d 264, 277 (3d Cir.1995).

In July, 1995, before this court had decided the matter on remand, Kellogg filed for bankruptcy in the Southern District of Florida. With the agreement of the parties, we placed the case on our civil suspense docket pending a resolution of the bankruptcy proceeding.

On December 12, 1995, the bankruptcy judge in Florida issued an Order granting in part Schreiber's motion for relief from the automatic stay. The Order stated in relevant part:

> upon the death of his mother, Fernanda Kellogg, when Kellogg would come into a significant inheritance.

---

1. The judgment consisted of the contractual fee of $80,000, prejudgment interest on the fee in the amount of $423,442.79, and $9,420.97 in costs and prejudgment interest.

2. At the non-jury trial in 1993, the court found that the May 13, 1981 written fee agreement between Schreiber and Kellogg was orally modified in October, 1985. In return for Schreiber's forbearance in not suing Kellogg, the latter agreed at that time to pay the fees and costs

3. For discussion of the purpose of a spendthrift trust, *see* IIA Austin Wakeman Scott, et al., *Scott on Trusts,* § 152, at 86–92 (4th ed. 1987). *See also In re Moorehead's Estate,* 289 Pa. 542, 137 A. 802, 804–05 (1927).

1. Creditor Palmer K. Schreiber is GRANTED relief from the automatic stay as follows:

> (a) to proceed to seek a determination from the United States District Court for the Eastern District of Pennsylvania regarding the existence, if any, of a lien in Mr. Schreiber's favor in the Debtor, Christopher Kellogg's interest in the Wanamaker Trust and the extent of Debtor's spendthrift exemption with regard to any such lien. Stay relief shall not extend to the enforcement of any lien ...

*In Re: Christopher Kellogg a/k/a Chris Kellogg, Debtor,* Case No. 95–32059–BRC–SHF, Chapter 7 Proceeding (Bank.Ct., S.D.Fl., Palm Beach Div.). After extensive briefing, the court held a hearing and argument on the issues outlined in the Bankruptcy Court's Order.

### I

Our first focus is on whether Schreiber, as counsel to Kellogg, rendered any services in the surcharge action which actually benefitted or preserved Kellogg's interest in the Wanamaker trust.

In October, 1978 Schreiber, along with Morton Rome, Esquire, filed in the Orphans' Court Division of the Court of Common Pleas of Montgomery County on behalf of Kellogg, a Petition for Surcharge and Removal of Trustees, Disqualification of Counsel for the Trustees, and Objections to Account. In that petition, Kellogg, at the time a contingent beneficiary, sought to surcharge the seven trustees for negligent conduct and mismanagement in connection with the operation and later sale of the John Wanamaker stores, then the principal asset of the trust. Kellogg further prayed for the removal of the trustees and appointment of replacements. Alleging a conflict of interest, Kellogg also requested the court to disqualify the law firm of Montgomery, McCracken, Walker & Rhoads as counsel for the trust and the trustees.

Schreiber's preparatory legal work began in May, 1978, approximately five months before the actual filing of the petition. The parties finally settled the matter three years later, in May, 1981, with Judge Taxis approving the settlement in July. No money was paid to the trust. The settlement absolved the trustees of any misconduct and left in place the current trustees as well as the Montgomery, McCracken law firm. The settlement specifically provided:

> 8. Kellogg retracts the charges made by him against the Trustees and Montgomery, McCracken, Walker & Rhoads in Kellogg's Surcharge Action and in all proceedings relating thereto, and Kellogg acknowledges that the Trustees' retention of Montgomery, McCracken, Walker & Rhoads in the past has been proper and that the Trustees may continue to retain Montgomery, McCracken, Walker & Rhoads in the future.

The settlement contained additional provisions. For the first time the trustees were required to send monthly reports as well as an annual report to all beneficiaries over 18 years old. These reports had to contain extensive financial information. In addition, the trustees were obligated to hold an annual meeting to which all beneficiaries were to be invited. The beneficiaries were entitled to be accompanied by or to send legal and financial advisors. As part of the settlement, trustees were to identify persons to whom commission business had been directed as well as related data. The beneficiaries were given the right to examine the records of the trust and to have disclosure of related party transactions. Finally, the settlement provided for the trustees to establish a retirement age for trustees, but with the present trustees protected by a "grandfather" clause.

 It is undisputed that Kellogg did not prevail on the specific relief sought in his surcharge petition. He did not succeed in having the trustees surcharged or removed and did not accomplish his goal of disqualifying the Montgomery, McCracken firm. Indeed, in the settlement petition approved by Judge Taxis, Kellogg specifically "retracts the charges" against the trustees and their attorneys and acknowledges that the retention of the law firm "has been proper" and "may continue ... in the future." So far as these charges are concerned, Schreiber ren-

dered no services that benefitted or preserved Kellogg's interest in the trust.

Nonetheless, the surcharge action settlement did contain provisions compelling disclosure of information to the beneficiaries. Kellogg argues that no real benefit was achieved in this regard because information was always available to any beneficiary who requested it. He also contends that in any event Pennsylvania trust law compelled the trustees to keep the beneficiaries informed. Kellogg further emphasizes that until the sale of the John Wanamaker stores in October, 1978, they were the principal asset of the trust. It was not until thereafter that the trust contained primarily intangible securities where financial disclosure could be more open and would not involve confidential information of a going business. Thus, to the extent the trustees had been secretive, it was allegedly for sound business reasons.

Despite Kellogg's arguments, the fact remains that the settlement changed the status quo. It bound the trustees to specific detailed disclosure requirements pursuant to a court order. Up to that time, the trustees were never under this type of obligation. Openness to the extent it existed was generally more a matter of discretion than of right. The trustees were not tied to any enforceable guidelines as to when, where, or how they disclosed information. In fact, as to the operation of the John Wanamaker stores, Judge Taxis had ruled, in interpreting Rodman Wanamaker's will, that the trustees were under no duty to provide any information at all. *Estate of Rodman Wanamaker, Deceased,* No. 79902 (C.P. Montg. County, Orphans' Ct. Div., March 13, 1979). The present situation is quite different. Any failure by the trustees to comply with the terms of the July, 1981 settlement order in issue subjects them to judicial sanction. With regular and frequent financial disclosures, the right of inspection, and an annual meeting, the beneficiaries can now keep a watchful eye on the trustees' activities, ask informed questions, and even make meaningful suggestions. The changes Schreiber obtained in

the settlement of the surcharge action constitute a real benefit to Kellogg's interest in the Wanamaker trust.[4]

■ It must be noted that the benefit, no matter how important, is not pecuniary in nature. No monetary value was added to Kellogg's interest in the trust. The Court of Appeals left open the question whether nonpecuniary benefits are of the kind for which compensation may be obtained from a spendthrift trust under § 157(c) of the Restatement (Second) of Trusts. *Schreiber v. Kellogg,* 50 F.3d at 278. While leaving the issue unresolved, the court cited *Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304, 1310–13 (3d Cir.1993). That was a shareholder derivative action. The issue on appeal concerned whether the court approved settlement was fair and adequate. The district court had concluded that the settlement provided a real benefit because the corporation was required to "institute internal mechanisms to prevent improper sales and marketing methods." *Id.* at 1310. In affirming, the Court of Appeals held that "nonpecuniary benefits to the corporation may support a settlement." *Id.* at 1311. The court continued:

> Lazar [an objector] asserts the structural relief merely amounts to a promise to obey the law. This mischaracterizes the agreement which answers the question how, not whether, the parent corporation will obey the law and provides specific mechanisms to ensure employees of Bell Atlantic and all its subsidiaries behave appropriately.

*Id.* at 1312. We see no reason why the analysis should be any different for a trust than for a corporation. A real or actual benefit to a trust interest under § 157(c) can be of a nonpecuniary or structural nature, and it was so here.

## II

Having found certain real benefits, we now turn to the question as to what part of Schreiber's fee is ascribable to those benefits.

4. Schreiber has not proven that the retirement plan for future trustees provided any real benefit

to Kellogg's interest in the trust.

Schreiber maintains and his time records confirm that he spent 861.25 hours on the surcharge action.[5] Although the court does not dispute this total, Schreiber may be compensated from the Wanamaker trust only for time reasonably expended to achieve an actual benefit to Kellogg's interest in it. We must carve out those hours which did not benefit Kellogg's interest as well as any time which was not reasonably spent in light of the quality and extent of the benefit achieved. While § 157(c) permits the court to reach the assets of a spendthrift trust, the amount to be reached for services rendered must necessarily be reasonable in light of the advantage received. Otherwise, there would be no protection for the prodigal beneficiary who contracted to pay an exorbitant sum for a real, but minimal benefit to his trust interest. Section 157(c) may not be used as an exception that swallows up the rule. The standard of reasonableness strikes the proper balance here between the conflicting purposes of § 157(c) and of a spendthrift trust.

The court must first eliminate any of Schreiber's time which clearly did not produce a benefit to Kellogg's interest in the trust. In this category was the attempt to disqualify the law firm of Montgomery, McCracken, Walker & Rhoads as counsel for the trustees and the trust. This effort, as stated above, was completely unsuccessful. Judge Taxis denied the motion to disqualify Montgomery, McCracken on January 19, 1979. Kellogg then appealed the disqualification motion to the Pennsylvania Supreme Court. This appeal was quashed as interlocutory on March 20, 1979. Ultimately, in the surcharge settlement approved by Judge Taxis, Kellogg went so far as to retract his allegations of any wrongdoing by Montgomery, McCracken and to admit that it was "proper" for the trustees to retain that firm.

Schreiber acknowledged at the March 7, 1996 hearing before this court that his primary efforts from approximately December, 1978 until March, 1979 were directed toward the motion to disqualify. Schreiber's time records support his testimony in this regard. He also spent a significant amount of time during this period framing Kellogg's objections to the preliminary objections of the trustees to the surcharge petition. This undertaking likewise did not attain any benefit for Kellogg.

Based on a review of Schreiber's time records, we find that he spent 14.75 hours in November, 1978, 166 hours in December, 1978,[6] 149 hours in January, 1979, 12 hours in February, 1979, and 24.25 hours in March, 1979, for a total of 366 hours on either the failed effort to disqualify Montgomery, McCracken or the failed objections to the trustees' preliminary objections to the surcharge petition. Nearly all of the entries from November 28, 1978 until March 20, 1979 specifically refer to these two tasks. There are a few entries which refer to telephone conferences or research without specifically citing any purpose.[7] However, these entries are so close in time to the other specific entries that the court is confident that these hours did not achieve a benefit for Kellogg. In any event, Schreiber has not established that these imprecise recordations are related to any real advantage achieved for Kellogg. *See Pawlak v. Greenawalt,* 713 F.2d 972, 978 (3d Cir.1983), *cert. denied sub nom. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Pawlak,* 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 172 (1984); *Walker v. Upper Merion Police Department, et al.,* 1996 WL 37822 (E.D.Pa., Jan. 26, 1996). The court therefore will subtract 366 hours from the 861.25 hours claimed by Schreiber. This leaves 495.25 hours for consideration.

These 495.25 hours can be divided into two periods. Schreiber worked 293.5 hours

---

5. We find that Schreiber spent 474.25 hours on the surcharge action in 1978, 283.25 hours in 1979, 64 hours in 1980, and 39.75 hours in 1981. Schreiber informed the court that he mistakenly included 5.25 hours for 12/14/78 and 12/15/78 on the time records. Therefore we have eliminated this time from the 479.5 hours Schreiber initially claimed for 1978. In addition, Schreiber cited a figure of 293.25 hours for 1979, but the correct figure is 283.25 hours.

6. We did not eliminate .5 hours claimed on 12/13/78 for a telephone conference regarding settlement of the surcharge petition.

7. *See* time sheets for 1/9/79; 1/24/79; and 2/1/79.

from May until November, 1978. During this interval he laid the groundwork for the surcharge petition through discussions and research, and ultimately prepared the surcharge petition itself. Schreiber then expended 201.75 hours from April, 1979 until May, 1981. This covered the point from the loss of the motion to disqualify Montgomery, McCracken through to the amicable resolution of the surcharge action. According to his testimony, Schreiber concentrated 90 percent of his time during this period on the settlement and 10 percent advising new counsel about Kellogg's case. The court will therefore subtract 20 hours, or approximately 10 percent of 201.75 hours, from 495.25 hours for a new base line figure of 475.25.

■ We must now decide what part of the remaining 475.25 hours can be attributed to any benefit Schreiber obtained for Kellogg's trust interest and whether this time was reasonably spent in that pursuit. Unfortunately, the evidence before us does not permit an exact line of demarcation between what is attributable to the real benefit achieved and what is not. Where it is difficult to apportion an attorney's hours, we "should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). We must then exercise our "equitable discretion ... by simply reducing the award to account for the limited success of the plaintiff." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 789–90, 109 S.Ct. 1486, 1492, 103 L.Ed.2d 866 (1989).

We first examine the reasonableness of the time between May and November, 1978 when Schreiber was doing his preparatory and related work for the surcharge petition, which was filed in October, 1978. This amounted to 293.5 hours. Schreiber has not established that every hour recorded during this period was necessary to the result. Some of the time, however, was crucial to an understanding of the complicated facts and issues involved and to the ultimate settlement. Without such preparation, it is highly unlikely that any benefit would have been achieved.

The second time frame runs from April, 1979 through May, 1981. After subtracting the 20 hours Schreiber spent advising new counsel, the total for this period is 181.75 hours. Schreiber testified before this court that he had nearly reached a settlement with the trustees in December, 1978, the terms of which were virtually identical to the final settlement in May, 1981. In December, 1978, however, Kellogg made additional demands, including appointment of himself as a trustee, which doomed any consummation of the settlement at that time. When examined in the light of this previous history and when measured against the extent of the benefit conferred, the 181.75 hours Schreiber spent negotiating the final settlement is inordinate. On the other hand, some of these hours were clearly necessary to reach an amicable resolution, which we have determined provided a benefit to Kellogg's interest in the Wanamaker trust.

■ Schreiber contends that even if the number of hours he incurred on the surcharge action appears excessive, he did so at the insistence of his client Kellogg. While that may be true, it does not change the court's decision. If the beneficiary imprudently agrees to pay more than he should for a real benefit, the service provider cannot obtain from the spendthrift trust under § 157(c) more than what is reasonable. Should the beneficiary have agreed, for example, to pay his counsel $1,000,000 for the benefit achieved here, the court would not allow such an exorbitant fee to be paid out of the spendthrift trust. The rule is the same if the beneficiary's intransigence or intemperance causes the benefit to cost more than it should. As we noted above, the standard of reasonableness must be applied when seeking to reach the assets of a spendthrift trust under § 157(c). This is not to say that the service provider is without any other recourse. If a valid contract between the beneficiary and the service provider calls for a higher than reasonable payment, the service provider, of course, may seek to collect the remainder from other assets of the beneficiary.

In deciding on what is a reasonable fee, we have focused on the relief obtained in the

surcharge action in relation to the hours expended on the entire litigation. *See Hensley v. Eckerhart, supra.* We apply our equitable discretion. *See Texas State Teachers Ass'n.,* 489 U.S. at 789–90, 109 S.Ct. at 1492–93. Under the totality of the circumstances, including our observation of Schreiber at the 1993 trial and subsequent hearings, we find that one-half, or 238 [8] of the remaining 475.25 hours he spent on the surcharge action are fairly attributable to the real benefit obtained for Kellogg's interest in the trust. This is the reasonable time incurred in obtaining the important but limited result of increasing the information flow to the beneficiaries of the Wanamaker trust. *See Texas State Teachers Ass'n., supra.* The 238 hours represents 27.6 percent of the 861.25 hours claimed by Schreiber.

■ Having concluded that Schreiber reasonably spent 238 hours in pursuit of the goals achieved by the surcharge action, we must also decide whether his hourly rate was reasonable. Schreiber's total fee was $80,000. His hourly rate was slightly lower than $100 per hour ($80,000 ÷ 861.25 hours). We find that this is not inappropriate given the year the agreement was made and the nature of the case. Accordingly, by multiplying $80,000 by 27.6 percent, Schreiber's fee attributable to the real benefit to Kellogg's trust interest is $22,080.

■ The major component of the August 3, 1993 judgment Schreiber seeks to collect is prejudgment interest on his $80,000 fee in the amount of $423,442.76. In the May 13, 1981 fee agreement between Schreiber and Kellogg, they contracted for an interest rate "which is commercially competitive considering the risk and terms of payment." At the 1993 trial, we determined, based on expert testimony and the prevailing interest rates for commercial loans at that time, that the parties had bargained for an interest rate of 13.21 percent. Here, however, Schreiber seeks to levy upon the spendthrift trust for the prejudgment interest. As a result, we must analyze independently the reasonableness of the interest rate. The court finds that the 13.21 percent rate of interest agreed upon by Kellogg and Schreiber is reasonable given the general interest rates at that time and the expected delay in payment. Therefore, Schreiber may collect from the Wanamaker trust an additional $116,870.20, which represents 27.6 percent of the contractual prejudgment interest on his fee, that is, the interest on $22,080.

As part of the 1993 judgment, the court also awarded Schreiber $9,420.97 for costs and prejudgment interest at the statutory rate of 6 percent. *See* 41 Pa.Stat.Ann. § 202. The costs were reasonable. In conformity with the formula determined above, Schreiber may secure 27.6 percent of this figure, or $2,600.19, from the spendthrift trust.

Accordingly, we conclude that the sum of $141,550.39 ($22,080 + $116,870.20 + $2,600.19), plus postjudgment interest since August 3, 1993, is the reasonable compensation to Schreiber for the actual benefits that he secured for Kellogg's interest in the Wanamaker trust.

### III

■ Kellogg contends that if any benefit was conferred on his interest in the Wanamaker trust, the cost of such a benefit should be divided among all 12 existing income beneficiaries. This argument is without merit. The other beneficiaries never engaged Schreiber or sought the benefits obtained by the surcharge action. Nor did they support the action after Kellogg initiated it. Moreover, a beneficiary who voluntarily secures services to protect his or her trust interest is responsible for paying that fee, even if those services ultimately benefit other beneficiaries. *See Harrison's Estate,* 221 Pa. 508, 70 A. 827 (1908); *Smaltz' Trust Estate,* 142 Pa.Super. 463, 469, 17 A.2d 455 (1940); *see also Feick v. Fleener,* 653 F.2d 69, 77–78 (2d Cir.1981). Therefore, only Kellogg's interest in the trust may be reached to pay the $141,550.39 and the applicable postjudgment interest.

### IV

Finally, pursuant to the bankruptcy court's order of December 12, 1995, we turn to the

---

**8.** This figure is rounded off to the closest hour.

question of whether Schreiber has a valid lien in Kellogg's interest in the Wanamaker trust sufficient to survive a discharge from Kellogg's bankruptcy proceeding in the Southern District of Florida.

■ The Bankruptcy Code defines a lien as a "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C. § 101(37). A lien survives discharge from a proceeding under Chapter 7 of the Bankruptcy Code. *See Estate of Lellock v. Prudential Ins. Co. of America*, 811 F.2d 186, 188 (3d Cir.1987); *In re McNeil*, 128 B.R. 603, 606 (Bkrtcy. E.D.Pa.1991). In addition, the legislative history of 11 U.S.C. § 522(c) specifically states that "the bankruptcy discharge does not prevent enforcement of valid liens ... on nonexempt property as well as on exempt property." H.R.Rep. No. 595, 95th Cong., 1st Sess. 361 (1977), reprinted in 1978 U.S.C.C.A.N., 5787, 5963, 6317.

■ We look to state law to determine the validity, nature and effect of liens in bankruptcy proceedings. This issue is governed by the substantive law of the state with jurisdiction over the property. *See In re Spectra Prism Industries, Inc.*, 28 B.R. 397, 399 (9th Cir. BAP 1993); *In re Lewis Energy Corp.*, 36 B.R. 205, 207 (Bkrtcy. D.Col.1983). Here, the Wanamaker trust was created under Pennsylvania law, and the trust corpus is located in this Commonwealth. Therefore, Pennsylvania law applies.

■ Furthermore, Rule 69(a) of the Federal Rules of Civil Procedure states that "[t]he procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held...." Schreiber seeks to execute a judgment rendered in the Eastern District of Pennsylvania. The Pennsylvania procedural rules for execution process therefore govern.[9] Kellogg concedes that Schreiber complied with the Pennsylvania Rules of Civil Procedure in filing and serving the writ of execution.

■ Rule 3111 of the Pennsylvania Rules of Civil Procedure delineates the effect of service of the writ on a garnishee. The rule provides:

> service of the writ upon the garnishee shall attach all property of the defendant ... which is in the possession of the garnishee. It shall also attach all property of the defendant ... which comes into the garnishee's possession thereafter until judgment against him even though no such property of the defendant was in his possession at the time of service.

Pa.R.Civ.P. 3111(b). Schreiber properly served a writ of execution for $512,863.76 on February 22, 1994 on the trustees of the Wanamaker trust. Schreiber has a valid writ of execution lien against Kellogg's trust interest. *See In re J. Robert Pierson, Inc.*, 36 B.R. 853 (Bkrtcy.E.D.Pa.) *aff'd*, 44 B.R. 556 (E.D.Pa.1984). Nonetheless, under the Pennsylvania law of trusts, as analyzed above, Schreiber's lien against Kellogg's interest in the Wanamaker trust is valid only to the extent of $141,550.39, plus post-judgment interest since August 3, 1993, the date of the judgment against Kellogg.

Kellogg continues to argue that no lien was created in Schreiber's favor because Schreiber's actions did not produce any substantial benefit. The court has already rejected this argument. In the alternative, Kellogg argues that even if Schreiber provided any benefit to Kellogg's interest, the lien which would result is erased by the amount spent to achieve that minimal benefit. Again, we have already considered this factor in determining the extent of the lien in Schreiber's favor.

## V

In conclusion, plaintiff Palmer K. Schreiber has a valid lien, under Pennsylvania law, against the interest of defendant Christopher

---

9. Rule 3108 of the Pennsylvania Rules of Civil Procedure governs service of the writ. This rule provides, in pertinent part:

> Service of the writ shall be made by the sheriff in the case of (4) other intangible personal property ..., by serving a garnishee....

Pa.R.Civ.P. 3108(a)(4).

G. Kellogg in the Rodman Wanamaker trust in the amount of $141,550.39, plus post-judgment interest on that amount from August 3, 1993.