**In re Richard G. CHRISTIE and Claudia Christie, Debtors.**

**Bankruptcy No. 97-33162.**

United States Bankruptcy Court, D. New Jersey.

Feb. 3, 1998.

Paul N. Mirabelli, Law Office of Paul N. Mirabelli, Hazlet, NJ, for Debtors.

Thomas H. Klein, Monmouth County Division of Social Services, Freehold, NJ, for Monmouth County Division of Social Services.

## OPINION

WILLIAM H. GINDIN, Chief Judge.

### PROCEDURAL HISTORY

This matter comes before the court as a motion to avoid judicial liens against the real property of Richard G. Christie and Claudia Christie (sometimes cumulatively, the "debtors") pursuant to 11 U.S.C. § 522(f)(1). The debtors seek to avoid three (3) liens; the only one in dispute, however, arises from a judgment entered by the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County ("Superior Court") on June 19, 1991, held by the Monmouth County Division of Social Services ("MCDSS"). The issue before the court is whether or not the judgment for child support, may be avoided as an impairment to a debtor's § 522(b) exemption.

This court conducted a hearing on this matter on August 4, 1997 and reserved decision. Counsel for both parties were invited to submit supplemental memoranda but each declined, deciding to rest on their initial submissions.

This court finds, for the reasons set forth below, that the Debtors' Motion to Avoid MCDSS' judicial lien, which secures a child support debt, can be granted pursuant to § 522(f)(1) because the lien impairs their homestead exemption under § 522(d)(1).

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the Standing Order of Reference by the United

States District Court for the District of New Jersey, dated July 23, 1984. This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(B), and (O).

### FACTS

Prior to the debtors' marriage, Mrs. Christie, formerly Claudia Howe, had two (2) children fathered by Mr. Christie: Dana, born on June 19, 1983 and Shannon, born on September 1, 1989. Mr. Christie's paternity was established for each child by court orders entered by the Superior Court on February 13, 1986 and March 25, 1993, respectively.

During this period, Mrs. Christie obtained public assistance from MCDSS on behalf of the children, commencing on June 19, 1983. In an action to determine the amount of Mr. Christie's child support payments for Dana, styled as *MCDSS v. Richard Christie*, FD–001142–86, the Superior Court of New Jersey entered an order on February 13, 1986, establishing a $40.00 per week obligation. A judgment was entered by the Superior Court on June 6, 1991, #J–68848–9.[1] Thereafter, a lien was placed on the debtors' residence located at 120 Forest Avenue, Keansburg, New Jersey ("residence") in favor of MCDSS. By order dated March 25, 1993, the February, 1986 order was modified to $165.00 per week, to include support for both children.

In the later part of 1993, Mrs. Christie declined public assistance. In an order entered on July 22, 1993, Mr. Christie's child support obligation was reduced to $35.00 per week by the Superior Court, reflecting arrears in past payments. On April 1, 1997, the debtors filed their voluntary petition under chapter 7 of Title 11. As of the filing date, MCDSS reported its claim as $13,424.39, plus $4,076.37 in interest ("MCDSS claim"). As of July 7, 1997, the MCDSS claim had been reduced to $12,619.39 through subsequent payments.

The debtors assert that the MCDSS lien may be avoided under 11 U.S.C. § 522(f)(1) because it impairs the $30,000.00 exemption the debtors are claiming in the residence pursuant to § 522(d)(1). As support, the debtors offered a real estate "market analysis," dated May 5, 1997, which values the residence at $69,000.00, and an attorney's certification that the residence is encumbered by a $50,442.61 first mortgage held by Ford Consumer Finance Co., Inc. Debtors argue that the statutory prohibition of avoidance of liens found in 11 U.S.C. § 522(f)(1)(A)(i), concerning child support obligations, is inapposite in this case because the lien was assigned to MCDSS in accordance with § 522(f)(1)(A)(ii)(I).

Conversely, MCDSS contends that its lien may not be avoided because it is statutory in nature, rather than judicial. Secondly, MCDSS argues that its lien falls within the statutory prohibition found in § 522(f)(1)(A)(i) because its assignment under N.J.S.A. 44:10–2, merely assigns the rights to pursue an obligation of a non-custodial parent, not the entitlement rights of a child to child support.

### DISCUSSION

**I. Jurisdictional Issues:**

Before this court addresses any substantive merits of this case, it must first determine whether it has subject matter jurisdiction over the claims. Congress has vested bankruptcy courts with jurisdiction over four kinds of Title 11 matters: (1) cases under Title 11; (2) proceedings arising under Title 11; (3) proceedings arising in Title 11; and (4) proceedings related to Title 11. *See* 28 U.S.C.A. § 1334(b); *See Donaldson v. Bernstein*, 104 F.3d 547 (3d Cir.1997); *In re Lands End Leasing, Inc.*, 193 B.R. 426 (Bankr.D.N.J.1996). The matter before this court, a motion to avoid a lien under 11 U.S.C. § 522(f)(1), clearly involves a matter arising under Title 11. Accordingly, this court has general jurisdiction over the Debtors' claim.

Recently, however, the Supreme Court in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) has placed limits on federal jurisdiction. The Court held that states or "arms of the state" may not be sued in federal courts

---

1. The debtors did not proffer a copy of the judgment.

because of the state's sovereign immunity under the Eleventh Amendment of the United States Constitution. Eleventh Amendment sovereign immunity claims must be raised at anytime, even on appeal. *See Patsy v. Board of Regents,* 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 2567 n. 19, 73 L.Ed.2d 172 (1982) (Supreme Court in dicta stated "that Eleventh Amendment is jurisdictional in the sense that it must be raised and decided by the Court on its own motion."). *See also, In re Kish,* 212 B.R. 808, 813 (D.N.J.1997) (a court is required to determine *sua sponte* whether Congress has effectively abrogated the states' Eleventh Amendment immunity); *In re Fennelly,* 212 B.R. 61 (D.N.J.1997) (same); *In re Midland,* 200 B.R. 453, 456 (Bankr.N.D.Ga.1996) ("new theory of Eleventh Amendment immunity strikes to the heart of bankruptcy court's jurisdiction" and could be presented at any stage of the proceedings.); *In re Rose,* 214 B.R. 372, 376–77 (Bankr.W.D.Mo.1997) (same).

The Eleventh Amendment of the Constitution provides: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." *U.S. Const.Amend. XI.* The policy behind Eleventh Amendment sovereign immunity has two presuppositions. First, each State is a sovereign entity in our federal system. *Seminole,* 517 U.S. 44, 51–53, 116 S.Ct. 1114, 1121, 134 L.Ed.2d 252 *quoting Hans v. Louisiana,* 134 U.S. 1, 11–14, 10 S.Ct. 504, 506, 33 L.Ed. 842, (1890). Second, "[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its [the states] consent." *Hans,* 134 U.S. at 12, 10 S.Ct. at 506 (*quoting* The Federalist No. 81, p. 487 (C. Rossiter ed. 1961) (A. Hamilton) (parentheses added)). *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146, 113 S.Ct. 684, 688–89, 121 L.Ed.2d 605 (1993) ("[t]he very object and purpose of the Eleventh Amendment was to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties."); *Fennelly,* 212 B.R. at 63 (same); *In re Martinez,* 196 B.R. 225, 228 (Bankr.D. Puerto Rico 1996) (same). *See also, Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 101, n. 11, 104 S.Ct. 900, 908, n. 11, 79 L.Ed.2d 67 (1984) (The Eleventh Amendment's general purpose is to foster states autonomy); *Fitchik v. New Jersey Transit Rail Operations, Inc.* 873 F.2d 655, 664 (3d Cir.1989) (same).

## A. Scope of Eleventh Amendment:

■ The Eleventh Amendment immunity extends only to states, arms of the state or state officials or agents and does not extend to counties and similar municipal corporations. *Mt. Healthy City School District Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *In re Decalcomania Mfg. Corp.,* 142 B.R. 670 (Bankr. D.N.J.1990). The Supreme Court in *Mt. Healthy City School District* held that the determination of the nature of a political entity will, in part, depend on state law. 429 U.S. at 280, 97 S.Ct. at 572. *See generally, Franceschi v. Schwartz,* 57 F.3d 828, 830 (9th Cir.1995) (state constitution and statutes give the State, not counties, discretion and control over municipal court judges).

■ Generally, under state law, a political entity will be considered an arm of the state if that entity receives a significant amount of money from the state. *Franceschi,* 57 F.3d at 830. The Third Circuit in *Christy v. Pennsylvania Turnpike Comm'n,* 54 F.3d 1140 (3d Cir.1995), *cert. denied* 516 U.S. 932, 116 S.Ct. 340, 133 L.Ed.2d 238 (1995), held that a court, in determining whether Eleventh Amendment immunity extends to an entity as arm of the state, must consider whether money that would pay any judgment would come from the state treasury. *Id.* at 1145. Other relevant factors include: (1) the status of that agency under state law (e.g. whether the agency has been separately incorporated; whether the agency has the power to sue or be sued and to enter into contracts; whether its property is immune from state taxation; and whether the sovereign has immunized itself from responsibility for the agency's operations); and (2) the degree of autonomy the agency has over its operations. *Id.* at 1144. *See Urbano v. Board of Managers of N.J. State Prison,* 415

F.2d 247, 251–52 (3d Cir.1969), *cert. denied,* 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 128 (1970) (initially set out factors for the determination of whether an entity is an arm of the state).

The court noted that no single factor is dispositive for purposes of Eleventh Amendment analysis. *Christy,* 54 F.3d at 1145. However, the court stated that the "most significant factor" is whether any judgment would be paid from the state treasury. *Id.* Accordingly, the court held that the Turnpike Commission was not an arm of the state because the funding sources (i.e. tolls), were not subject to state regulation; it did not rely on state assistance to satisfy any judgments against it; and the sovereign did not immunize itself under state law. *Id.* 1146–47. Accordingly, the court found that the Turnpike could not be granted immunity despite the fact that Pennsylvania law granted the Turnpike immunity in state court.[2] The court reasoned that the most significant factor, i.e. whether judgment would be paid from state treasury, weighed in favor of finding that such entity was not an arm of the state. *Christy,* 54 F.3d at 1148. *See Peters v. Delaware River Port Authority of Pennsylvania and New Jersey* ("DRPA"), 16 F.3d 1346, 1350 (3d Cir.1994), *cert. denied,* 513 U.S. 811, 115 S.Ct. 62, 130 L.Ed.2d 20 (1994) (DRPA not entitled to Eleventh Amendment immunity from federal civil rights claim because the entity was financially self-sustaining and any judgment would not be satisfied by the state treasury); *Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d 655, 660–61 (3d Cir.1989) (same in context of mass tort claim against transit corporation); *e.g.* N.J.S.A. § 27:25–17 (West Supp.1988) (statute specifically disclaims state liability for transit debts); *see also, Decalcomania,* 142 B.R. at 673 (City of Camden not afforded Eleventh Amendment immunity although it performed the governmental function of collecting delinquent property taxes on behalf of state). *Accord, Kovats v. Rutgers, the State University,* 822 F.2d 1303 (3d Cir.1987), *cert. denied, Varma v. Bloustein,* 489 U.S. 1014, 109 S.Ct. 1126, 103 L.Ed.2d 188 (1989) (university mostly funded by state funds not afforded Eleventh Amendment immunity). *But see, Franceschi,* 57 F.3d at 831 (Eleventh Amendment immunity conferred on municipal courts because it was found to be an arm of the state given the extensive control the state has over it); *Root v. Schenk,* 953 F.Supp. 1115 (C.D.Cal.1997) (same).

At first blush, MCDSS appears to be an entity controlled by the county government. In such a case, MCDSS would not be afforded sovereign immunity because the Eleventh Amendment "extends only to states, arms of the state or state officials or agents and does not extend to counties and similar municipal corporations." *Mt. Healthy City School District Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *In re Decalcomania Mfg. Corp.,* 142 B.R. 670 (Bankr.D.N.J.1990). However, this court finds, to the contrary, that Eleventh Amendment immunity should be extended to MCDSS given the extensive amount of control the State of New Jersey has chosen to exercise over the county welfare administrative agencies.[3] Moreover, MCDSS could be considered an arm of the state because that agency does not have the power to immunize itself from responsibility for the agency's operations.[4] Thus, it can be

---

**2.** See 36 P.S. §§ 651.9–11 (state treats such an entity as a surrogate because it could exercise eminent domain).

**3.** *See* N.J.S.A. 44:10–5.5, which provides that the Department of Human Services shall promulgate rules and regulations (3)27 to effectuate the purpose of Assistance for Dependent Children Act. N.J.S.A. 44:10–3 also provides that the Commissioner of Human Services is authorized to "issue all necessary rules and regulations and administrative orders, and to do or cause to be done all other acts and things necessary to secure for the State of New Jersey the maximum Federal financial participation available." Specifically, the

Commissioner is charged with "assuring that the program be in affect in all counties of the state and be mandatory upon them (3)27" N.J.S.A. 44:10–3(a). Thus, it appears that MCDSS, is a county agency responsible for administering the AFDC program. However, it appears that the State Commissioner extensively regulates counties responsible for administering those AFDC programs. As a result, MCDSS can be considered an agency of the state because it has very little autonomy and is extensively regulated by the State.

**4.** Specifically, only the state legislature, by enacting N.J.S.A. 59:13–3 (waiver of immunity in con-

inferred that MCDSS is a state entity because that agency has very little autonomy over its operations.

As previously noted, however, the most important issue for purposes of Eleventh Amendment analysis is whether or not any judgment would be paid from the state treasury. In New Jersey, the state has chosen to pay all contract liability claims, incurred by the State [or agency of the state], that are reduced to final judgment. *See* generally, N.J.S.A. 59:13-9 (West 1982). In this instance, it appears that MCDSS' judgment for child support is based on contractual liability of the Debtors because assignment of the right to collect child support from the obligor parent was a condition for the receipt of AFDC funds. Additionally, under New Jersey state law, the State is responsible for any costs associated with the administration of AFDC funds.[5] These costs could conceivably include suits to collect child support arrears in an effort recoup AFDC payments. Therefore, it appears MCDSS is a state entity entitled to Eleventh Amendment immunity.

## B. Exceptions to Eleventh Amendment Immunity:

### 1. Valid abrogation of Eleventh Amendment:

In recent years, the Eleventh Amendment has "emerged from relative obscurity to become a major focus of constitutional controversy." Daniel Meltzer, *The Seminole Decision and State Sovereign Immunity,* 1996 Sup.Ct.Rev. 1. The Supreme Court, in *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), examined when Congress can properly abrogate the states sovereign immunity under the Eleventh Amendment. In order to determine whether Congress has abrogated the states's sovereign immunity, two questions must be resolved: first, whether Congress has "unequivocally expresse[d] its intent to

abrogate immunity." *Id.* at 55, 116 S.Ct. at 1123, 517 U.S. at 55, 116 S.Ct. at 1123 quoting *Green v. Mansour,* 474 U.S. 64, 68–70, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985); and second, whether Congress has acted "pursuant to a valid exercise of power." *Ibid.*

The Court held that the Indian Gaming Regulatory Act (the "Act"), which permits gaming activities by the Seminole Indians on federal lands, did "unequivocally" abrogate the Eleventh Amendment sovereign immunity of the states. *Id.* 517 U.S. at 55–56, 116 S.Ct. at 1123. First, the Court determined that the language of the Act indicates that Congress clearly intended to abrogate the State's immunity. *Id.* Specifically, the Court found that the language of the Act, which required the state to submit to a mediator and to enter into good faith negotiations regarding disputes over Indian gaming, was clearly abrogative of the State's sovereign immunity. *Id.*

Second, the Court found that such legislation was passed pursuant to a valid exercise of power, i.e. the Indian Commerce Clause. *Id.* at 58–60, 116 S.Ct. at 1125. The Court noted that the abrogation power is generally permissible in the context of the Interstate Commerce Clause because "Congress' authority to regulate interstate commerce would be incomplete without that necessary power." *Id.* at 61, 116 S.Ct. at 1126 (citing *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 19–20, 109 S.Ct. 2273, 2284–2285, 105 L.Ed.2d 1, (1989)). In addition, abrogation is also permitted in the context of § 5 of the Fourteenth Amendment whereby Congress is given expansive powers in order to "enforce, by appropriate legislation, the provisions of this article." *U.S. Const., XIV Amend., § 1.* The Court reasoned that the Fourteenth Amendment, which contains prohibition expressly directed to the states, necessarily abrogates the states' Eleventh

---

tract claims) and N.J.S.A. 52:4A–1 (assertion of sovereign immunity in tort claims), has the power to immunize state agencies from liability.

5. *See* N.J.S.A. 44:10–5 provides that "the state shall pay to each county welfare agency the full amount of any funds received by the State from federal government as federal participation with

respect to expenditures made by such county welfare for Aid to Families with Dependent Children (AFDC)." N.J.S.A. 44:10–5 (West 1996 Pocket part). Thus, it could be inferred that any AFDC monies recouped by counties, via child support judgments, are monies belonging to the state because the AFDC funds given to each county come from state and federal funds.

Amendment sovereign immunity and does "fundamentally alter the balance of state and federal power ..." *Id.* (quoting *Fitzpatrick v. Bitzer,* 427 U.S. 445, 453, 96 S.Ct. 2666, 2670, 49 L.Ed.2d 614 (1976)). In the context of the Indian Commerce Clause, however, the Court held that the abrogation power was not "necessary" to Congress' exercise of power over the Indian tribes. *Id.* As a result, the Seminole Indian tribe could not force the State to negotiate in good faith toward the formation of a Tribal–State compact, which governed the conduct of gaming activities.

## 2. Waiver of Sovereign Immunity under § 106 of the Bankruptcy Code:

■ *Seminole* does impact section 106(a) [6] of the Bankruptcy Code, at least to the extent that the State is "a party against whom a case in law or equity is commenced" in a bankruptcy proceeding. *U.S. Const.Amend. XI.* The district court in *In re Sacred Heart Hospital of Norristown,* 204 B.R. 132 (E.D.Pa.1997) *aff'd* 133 F.3d 237 (3d Cir. Pa.1998), held that the Pennsylvania Department of Public Welfare ("DPW") was entitled to assert an Eleventh Amendment sovereign immunity defense to a claim a Chapter 11 debtor hospital brought against it for some medical treatments provided to patients receiving public assistance. *Id.* at 136. The district court held that *Seminole* was controlling, although the constitutionality of § 106(a) was not specifically before the Court. *Sacred Heart,* 204 B.R. at 138. The court found that Congress purported to abrogate the states' Eleventh Amendment immunity in bankruptcy proceedings when it enacted § 106(a) pursuant to the Bankruptcy Clause. The Bankruptcy Clause provides: "[t]he Congress shall have the power [t]o establish uniform laws on the subject of Bankruptcies." *U.S. Const., art. I, § 8, cl. 4.* By analogy, the court held that the Bankruptcy Clause was similar to the Indian Com-

merce Clause in both wording and scope, and therefore § 106(a) is unconstitutional. 204 B.R. at 138. The court reasoned that § 106(a) fundamentally changes the state-federal relationship that the Eleventh Amendment was designed to balance. *Id. See Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 241, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171 (1985), *reh'g denied,* 473 U.S. 926, 106 S.Ct. 18, 87 L.Ed.2d 696 (1985) (waivers of Eleventh Amendment immunity fall subject to the most stringent examinations).

Recently, the Third Circuit, in *In re Sacred Heart Hospital of Norristown,* 133 F.3d 237 (3d Cir. Pa.1998), upheld the district court's holding that Congress, by enacting § 106(a), "unequivocally expressed its intent to abrogate the states' Eleventh Amendment immunity under the Bankruptcy Code." 133 F.3d 237, 242. *See Matter of Fernandez,* 123 F.3d 241, 243 (5th Cir.1997) (same); *In re Creative Goldsmiths of Washington, D.C., Inc.,* 119 F.3d 1140, 1145 (4th Cir.1997) (same). The Third Circuit, however, analyzed the constitutionality of § 106(a) under the second-prong of *Seminole Tribe,* i.e. whether Congress acted pursuant to a valid exercise of its power. 133 F.3d 237, 242. The court held that under *Seminole,* Congress did not act pursuant to a valid exercise of its power because abrogation of the states' sovereign immunity may not be done under its Article I powers. *Id.* quoting *Seminole Tribe,* 517 U.S. at 71–74, 116 S.Ct. at 1131–32. The court rejected Sacred Heart's argument that section 106(a) was enacted pursuant to § 5 of the Fourteenth Amendment [7]. 133 F.3d 237, 243.

Specifically, the court noted that "§ 5 is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantee of the Fourteenth Amendment." 133 F.3d 237, 243

---

6. Section 106(a) of the Code provides in relevant part: "Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth within this section ..." 11 U.S.C. § 106(a).

7. The Due Process Clause of the Fourteenth Amendment provides: "no state shall deprive

any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV, § 1. Section Five of the Fourteenth Amendment gives Congress the power "to enforce, by appropriate legislation, the provisions of this article." U.S. Const. Amend. XIV, § 5.

(*quoting Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 1723–24, 16 L.Ed.2d 828 (1966)). *See also, City of Boerne v. Flores,* —— U.S. ——, ——, 117 S.Ct. 2157, 2164, 138 L.Ed.2d 624 (1997) (same). Accordingly, the court found that Congress, in enacting the 1994 Amendments to the Code, "exercised the same specifically enumerated Article I bankruptcy power that it has traditionally relied on in enacting prior incarnations of the bankruptcy law dating back to 1800—68 years before the passage of the Fourteenth Amendment." 133 F.3d 237, 243 (quoting *Creative Goldsmiths,* 119 F.3d at 1146). Therefore, the court did not presume that Congress, by enacting § 106(a), "intended to enact a law under a general Fourteenth Amendment power to remedy an unspecified violation of rights when a specific substantive Article I power clearly enabled the law." *Ibid. See Kish,* 212 B.R. at 815–17 (Division of Motor Vehicles, as a real party in interest, entitled to Eleventh Amendment immunity because Congress did not validly abrogate its immunity pursuant to § 5 of the Fourteenth Amendment).

In sum, any analysis of *Seminole* finds § 106(a) unconstitutional because that provision "unequivocally abrogates" the state's sovereign immunity as guaranteed by the Eleventh Amendment. Accordingly, any assertion that MCDSS waived its sovereign immunity by virtue of § 106(a) must be rejected.

The Third Circuit has not specifically addressed the issue of whether a state or governmental entity waives its Eleventh Amendment immunity by filing a proof of claim pursuant to § 106(b). Section 106(b) provides:

> "[a] governmental unit that has filed a proof of claim in the case is deemed to have waived its sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence which the claim of the governmental unit arose". 11 U.S.C. § 106(b).

**8.** It should be noted that the Supreme Court in *Jean v. Nelson,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) held that federal courts must

Recently, the Fourth Circuit in *Creative Goldsmiths* examined *Seminole* and held that § 106(b), which was enacted pursuant to Congress' Article I powers under the Bankruptcy Clause, was an unconstitutional abrogation of the states' sovereign immunity. *Creative Goldsmiths,* 119 F.3d at 1147. The court stated that the use of the words "deemed to have waived sovereign immunity" in § 106(b) amounts to language of abrogation. *Id.* (quoting 11 U.S.C. § 106(b)). As a result, that court held that any waiver of sovereign immunity pursuant to § 106(b) was invalid. *See Matter of Fernandez,* 123 F.3d 241 (5th Cir.1997) (same).

Some courts, however, have held that § 106(b) constitutes a valid waiver of sovereign immunity. *See AER–Aerotron, Inc. v. Texas Dep't. of Transp.,* 104 F.3d 677, 680 (4th Cir.1997) (the court, without reaching the constitutional issues in *Seminole,* held that filing of a proof of claim still acts as a waiver of immunity with regard to claims of the debtor arising out of the same transaction); *Fennelly,* 212 B.R. at 63 (state consented to suit and waived its' Eleventh Amendment sovereign immunity when it filed a proof of claim in debtor's case); *Sacred Heart,* 204 B.R. at 142 ("a litigant filing a proof of claim submits itself to the power possessed by the court under § 106(b)—nothing more, nothing less."). *See also, Hoffman v. Conn. Dept. of Income Maintenance,* 492 U.S. 96, 101, 109 S.Ct. 2818, 2822–23, 106 L.Ed.2d 76, (1989) (Supreme Court in dicta stated that filing a proof of claim is necessary for a finding of strict waiver of sovereign immunity). *But see, New Jersey v. Mocco,* 206 B.R. 691, 693 (D.N.J.1997) (court stated in dicta that filing a proof of claim does not constitute waiver of immunity) *Cf., In re William Ross, Inc.* 199 B.R. 551, 553 (Bankr.W.D.Pa.1996) (interagency setoff under § 106(c) not permitted because the Commonwealth of Pennsylvania only consented to contract suits instituted in the Board of Claims, not federal courts).

In the instant case, § 106(b) would appear to be unconstitutional under *Seminole,*[8]

consider the nonconstitutional grounds for the decision before reaching constitutional issues. *Id.* at 854, 105 S.Ct. at 2997. In this case,

Thus, it appears that MCDSS' sovereign immunity could not be validly waived under § 106(b). Particularly, the use of the words "deemed to have waived sovereign immunity" in § 106(b) probably amounts to language of abrogation. *Creative Goldsmiths*, 119 F.3d at 1147 quoting 11 U.S.C. § 106(b). Further, § 106(b) could be an unconstitutional abrogation of the states' sovereign immunity because this provision was enacted pursuant to Congress' Article I powers under the Bankruptcy Clause, and not pursuant to § 5 of the Fourteenth Amendment. *Id.*

### 3. General Waiver of Sovereign Immunity:

█ The Eleventh Amendment itself contemplates a general waiver of sovereign immunity under certain circumstances. A state, however, without resort to § 106(b), may waive its sovereign immunity under general principles of waiver. The scope of the Eleventh Amendment only applies to "suits commenced or prosecuted against one of the United States." *U.S. Const.Amend.* XI. Read literally, a state will be granted sovereign immunity under the Eleventh Amendment if a private citizen commenced or prosecuted a claim *against* it. The Fourth Circuit, however, stated that it would violate "the fundamental fairness of judicial process to allow a state," who voluntarily enters a federal forum, "to proceed affirmatively in federal court and at the same time strip the defendant of valid defenses because they might be construed as actions *against* the state." *Creative Goldsmiths*, 119 F.3d at 1148. Particularly, "when a state authorizes its officials to voluntarily invoke federal process in a federal forum, the state thereby consents to the federal forum's rules of procedure and may not invoke sovereign immunity to protect itself against the interposition of defenses to its action." *Creative Goldsmiths*, 119 F.3d at 1148. Accordingly, the court narrowly held that " . . . . to the extent a defendant's assertions in a state-instituted federal action, including those made with regard to a state-filed proof of claim in a bankruptcy action, amount to a compulsory

counterclaim, a state has waived any Eleventh Amendment immunity against that counterclaim . . ." *Id.* Courts, however, have warned that any abrogation of a constitutional right should be closely scrutinized.

In addition, courts, in determining what claims are part of the "same transaction or occurrence" look to the standards used to identify compulsory counterclaims under Federal Rule of Civil Procedure 13(a). *Sacred Heart*, 204 B.R. at 141 citing *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34, 112 S.Ct. 1011, 1014–15, 117 L.Ed.2d 181 (1992). The Third Circuit held that a claim will be considered a compulsory counterclaim if that claim "bears a logical relationship" to the opposing party's claim. *In re University Med. Ctr.*, 973 F.2d 1065, 1086 (3d Cir.1992).

In the instant case, the facts indicate that the Debtors filed a case in bankruptcy on April 1, 1997. The facts are unclear, but MCDSS appears to have filed a proof of claim in order to enforce the child support orders obtained by the state court. In response, the Debtors sought to avoid MCDSS' child support judgment lien because it impaired their exemptions under § 522 of the Code. Therefore, it appears that MCDSS, by filing a proof of claim, voluntarily submitted itself to a federal forum. This court finds that MCDSS waived its sovereign immunity under the Eleventh Amendment because it would violate "the fundamental fairness of judicial process" to allow MCDSS "to proceed affirmatively in federal court and at the same time strip the defendant [Debtors] of valid defenses because it might be construed as actions *against* the state." *Creative Goldsmiths*, 119 F.3d at 1148. (parenthetical added). Furthermore, the Debtors motion to avoid a lien that impairs an exemption under § 522(f)(1) is a valid defense or compulsory counterclaim to MCDSS' proof of claim against the estate. Applying the "same transaction and occurrence" standard, it appears that the Debtors' compulsory counterclaim "bears a logical relationship" to MCDSS' claim, which seeks to satisfy a child support judgment by attaching a lien on the

---

discussed *infra*, this court found that MCDSS waived its Eleventh Amendment immunity under general waiver principles. However, in light of

the recent holdings by the Third Circuit, this court believes that 106(b) may be unconstitutional. *See Fennelly*, 212 B.R. at 64, n. 2. (same).

Debtors' realty. *In re University Med. Ctr.,* 973 F.2d 1065, 1086 (3d Cir.1992). Accordingly, under these circumstances, MCDSS is deemed to have waived its sovereign immunity and the Debtors will be permitted to assert their defense under § 522(f)(1).

Alternatively, the Third Circuit in *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board,* 131 F.3d 353 (3d Cir. N.J.1997), examined the *Parden* doctrine of constructive waiver in an action for patent infringement and false advertising under the Lanham Act. *See generally, Parden v. Terminal Ry. of Ala. State Docks Dep't.,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). The modern *Parden* doctrine, which holds that a state's Eleventh Amendment immunity can be constructively waived if: (1) Congress enacts a law providing that a state will be deemed to have waived its Eleventh Amendment immunity if it engages in the activity covered by the federal legislation; (2) the law contains a clear statement that gives notice to the states; (3) a state then engages in that activity covered by the federal legislation; and (4) the activity in question is not an important or core governmental function. *College Savings,* 131 F.3d 353, 363.

The court, using the modern *Parden* doctrine, found that the first three prongs were met. Specifically, the court found that Florida Prepaid engaged in conduct covered under the Lanham Act, i.e. marketing and selling tuition prepayment programs designed to provide sufficient funds to cover future college expenses that were similar to College Savings patented technology. *College Savings,* 131 F.3d 353, 363. Additionally, the court found that the Lanham Act gave clear notice to the state (i.e. Florida Prepaid). Further, the court found that Florida Prepaid continued to engage in activity, which is proscribed under the Lanham Act, after it had clear notice. *Id.* The court, however, held that Florida Prepaid did not waive its sovereign immunity under the *Parden* doctrine because the activity in question, education, is an important or core governmental function. *College Savings,* 131 F.3d 353, 363–64. *See Brown v. Board of Educ.,* 347, U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873

(1954) ("education is perhaps the most important function of state and local governments."). Ultimately, the court found that the investment scheme employed by Florida Prepaid, although it did not provide for education directly, provided a means through which individuals can save for the costs of college tuition. 131 F.3d 353, 364–65. *Cf., Employees of the Dep't of Pub. Health & Welfare v. Dep't of Public Health and Welfare,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973) (no abrogation of Missouri's Eleventh Amendment immunity under the Fair Labor Standards Act because regulation of labor standards was an important governmental function).

In addition, the Supreme Court in *Seminole* stated that Congress' abrogation power is generally permissible in the context of the Interstate Commerce Clause. *Seminole,* 517 U.S. at 60–62, 116 S.Ct. at 1126. Accordingly, use of the *Parden* doctrine in *College Savings* was proper because Interstate Commerce Clause was the source of power Congress used in enacting the Lanham Act. *College Savings,* 131 F.3d 353, 357–58. *See Parden,* 377 U.S. at 190–91, 84 S.Ct. at 1211– 12 (Congress, despite sovereign immunity claim, had the power to apply FELA to the states by virtue of the Interstate Commerce Clause). *But see, Welch v. Texas Dept. of Highways and Public Transp.,* 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987) (partially overruling *Parden* by holding that Congress can abrogate the Eleventh Amendment when it acts pursuant to Commerce Clause only if it expresses its intent to do so in unmistakable language within the statute itself). The *Parden* doctrine, on the other hand, is not available if abrogation is done pursuant to some other source of Congressional power, i.e. Article I powers. *See Creative Goldsmiths,* 119 F.3d at 1147 quoting *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1360–61, 39 L.Ed.2d 662, (1974) ("constructive consent is not a doctrine commonly associated with surrender of constitutional rights."); *Midland,* 200 B.R. 453, 458 (Bankr.N.D.Ga.1996) (same).

In this instance, the *Parden* doctrine is not available as an exception to any sovereign immunity MCDSS may have under the Elev-

enth Amendment, at least to the extent that consent to federal jurisdiction is grounded upon § 106(b) of the Code. As discussed above, some courts have held that waiver under § 106(b) is unconstitutional because it is an invalid abrogation of the Eleventh Amendment. Particularly, courts have found the source of abrogation under § 106(b) to be invalid because that provision was enacted pursuant to an Article I power. *See generally, Seminole; Sacred Heart; Creative Goldsmiths* (citations omitted). As a result, MCDSS' sovereign immunity cannot be validly waived by virtue of § 106(b).

### 4. Waiver under State Law:

Similarly, courts have held that a state can waive its Eleventh Amendment immunity and consent to federal jurisdiction under state law. *Creative Goldsmiths,* 119 F.3d at 1147. Courts will often look to state law when a state has voluntarily initiated an action in federal court. *Id.* at 1148. Also, courts will determine whether the state officer is authorized to proceed in federal court. *Id.* The court in *Creative Goldsmiths,* in determining whether a state has validly consented to federal jurisdiction under state law, examined Maryland state law. That state's law provided for waiver of sovereign immunity if two conditions are met: first, the Legislature must authorize suits for damages; second: there must be a provision for the payment of judgments. *Creative Goldsmiths,* 119 F.3d at 1149 quoting *Kee v. State Highway Admin.,* 313 Md. 445, 545 A.2d 1312, 1317 (1988). *See Bolden v. Southeastern Pennsylvania Transp. Auth.,* 953 F.2d 807, 813–14, (3d Cir.1991), *cert. denied,* 504 U.S. 943, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992), quoting *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974) (Eleventh Amendment prevents a citizen from proceeding against the state, or an instrumentality of the state, unless that state has properly consented to such suit)); *Port. Auth. Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 304, 110 S.Ct. 1868, 1872, 109 L.Ed.2d 264 (1990) (suit allowed directly

against the state if sovereign immunity is properly waived).

In this instance, the New Jersey State Legislature authorizes suits for damages and gives its state officials the power to sue on its behalf. Particularly, New Jersey state law implicitly authorizes state officials to sue in any forum in order to collect child support from legally liable persons.[9] Moreover, New Jersey state law and related practice guidelines have several provisions governing the payment of child support judgments.[10] Accordingly, MCDSS, as a state official is authorized to proceed in federal courts in order to enforce payment of its child support judgment.

### 5. Ex parte Young Doctrine:

Finally, the *Ex Parte Young* doctrine is another narrow exception to the general sovereign immunity principles set forth in the Eleventh Amendment. Particularly, the Supreme Court, in *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), held that an individual may sue a state official for prospective equitable relief requiring the state official to cease violating federal law, even if the state itself is immune from suit under the Eleventh Amendment. *Id.* at 155–66, 28 S.Ct. at 452–53. *See generally, Pennhurst,* 465 U.S. at 102, 104 S.Ct. at 908; *Sacred Heart,* 204 B.R. at 137; *See Sofamor Danek Group, Inc. v. Brown,* 124 F.3d 1179, 1183 (9th Cir.1997) (alleged violation of Lanham Act by state official). In this instance, the Debtors do not seek prospective relief to enjoin a state official from violating federal law, the *Ex Parte Young* doctrine, therefore does not apply.

Based on the foregoing, as for jurisdiction, this court finds that it can constitutionally exercise jurisdiction over the parties respective claims.

### II. Merits of the Case:

#### A. *Classification of Lien*

The court is first called upon to characterize the nature of the MCDSS lien. The

---

**9.** See discussion of N.J.S.A. 44:10–2 (i.e. provides for assignment of AFDC welfare payments to local agencies) and related case law *infra* at p. 44–46.

**10.** See discussion of N.J.S.A. 2A:17–56.23a and related practice guidelines *infra* at 42–44.

Bankruptcy Code defines a "lien" as a "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C. § 101(37). A lien "implies that one is in possession of property of another, and that [s]he detains it as security for some demand which [s]he has in respect to it ..." *J.T. Evans Co. v. Fanelli*, 59 N.J.Super. 19, 157 A.2d 36, 39 (Law Div. 1959). Generally, the Bankruptcy Code envisions three (3) types of liens: judicial liens; statutory liens; and security interests or consensual liens [11]. *Graffen v. City of Philadelphia*, 984 F.2d 91, 95 (3d Cir.1992); 9A Am. Jur.2d Bankruptcy § 1224 (1991). The Code, however, gives "very little guidance for distinguishing a judicial lien from a statutory lien other than the ... less lucid definitions ... provided in the Code or in pertinent legislative history." *In re Aikens*, 87 B.R. 350, 353–54 (Bankr.E.D.Pa.1988). These three types of liens are mutually exclusive and exhaustive except for certain common-law liens. *Aikens*, 87 B.R. at 353; *Evans*, 157 A.2d at 38–9.

A "judicial lien" is a "lien obtained by judgment, levy, sequestration, or other legal or equitable process" or court-related action [12]. 11 U.S.C. § 101(36). Further, a judicial lien is also defined as "a charge against or interest in property to secure a payment of a debt." [13] *In re Ashe*, 669 F.2d 105, 107

(3d Cir.1982), *cert. denied*, 465 U.S. 1024, 104 S.Ct. 1279, 79 L.Ed.2d 683 (1984). Additionally, courts have held that any liens obtained by the judicial or administrative adjudicatory process are judicial liens. *See Ashe*, 669 F.2d at 107–108 (lien obtained by confessed judgment was a judicial lien because its validity and effectiveness required subsequent judicial action); *In re Gardner*, 685 F.2d 106 (3d Cir.1982), *cert. denied*, 459 U.S. 1092, 103 S.Ct. 580, 74 L.Ed.2d 939 (1982) (public welfare lien on real property of debtor under a signed public assistance reimbursement agreement containing confession of judgment provisions were judicial liens because the notes were not valid and enforceable until filed as judgments); *See also, In re Barbe*, 24 B.R. 739 (Bankr.M.D.Pa.1982) (overpayment of unemployment compensation was a judicial lien because the lien held by debtor was preceded by an administrative adjudicatory process tantamount to a judicial proceeding); 4 *Collier on Bankruptcy* ¶ 7.04[4], P. 7–34 (Matthew Bender 15th ed. Revised).

The Code defines a statutory lien as a "lien arising solely by force of statute on specified circumstances or conditions ... whether or not such interest or lien is provided by or is dependent on a statute and whether or not such interest or lien is made fully effective by statute ..." or is properly recorded. 11

**11.** A security interest is a lien created by agreement. 11 U.S.C. § 101(51).

**12.** A judicial lien should not be confused with a judgment lien. A judicial lien describes any lien obtained through use of a court related action. A judgment lien is one form of a judicial lien. David G. Epstein, *Bankruptcy and other Debtor–Creditor Law in a Nutshell*, 42, n. 7 (West 5th ed. 1995). Under New Jersey law, a judgment would not constitute a lien until entered on the civil judgment and order docket. Local Court Rules Governing Civil Practice, 4:47. *See New Brunswick Sav. Bank v. Markouski*, 123 N.J. 402, 587 A.2d 1265 (1991) (a creditor need only to enter a judgment in the records of the Superior Court to establish a lien on debtor's real property); *See also, Brescher v. Gern*, 245 N.J.Super. 365, 585 A.2d 961 (App.Div.1991) (court judgment did not create statewide lien upon debtor's property until it was docketed or entered by clerk of the Superior Court); *In re Arevalo*, 142 B.R. 111 (Bankr.N.J.1992).

**13.** There are some courts that recognize equitable liens. The Third Circuit defines an equitable

lien as "the agreement to charge specific property with the payment of a debt." *Gardner v. Commonwealth of Penn., Dept. of Public Welfare*, 685 F.2d 106, 108 (3d Cir.1982). There is, however, some disagreement among the circuit courts, as to whether an equitable lien can be a judicial lien. *In re Donahue*, 862 F.2d 259 (10th Cir.1988). Some courts have found equitable liens to be judicial liens. *In re Pederson*, 78 B.R. 264 (9th Cir. BAP 1987); *In re Dudley*, 68 B.R. 426 (Bankr.S.D.Fla.1986).

Conversely, other courts have held that an equitable lien does not fall within the concept of a judicial lien and therefore is not avoidable under section 522(f)(1). *In re Gugenhan*, 55 B.R. 507 (Bankr.D.Kan.1985); *In re Lodek*, 61 B.R. 66 (Bankr.W.D.Tex.1986); *In re Miller*, 58 B.R. 192 (Bankr.S.D.Tex.1985). Nonetheless, where the lien arises from a divorce decree, irrespective of whether that lien is called an equitable lien, vendors lien or security interest, the lien is considered a judicial lien. *Farrey v. Sanderfoot*, 500 U.S. 291, 111 S.Ct. 1825, 114 L.Ed.2d 337 (1991).

U.S.C. § 101(53). *Aikens,* 87 B.R. at 353; *In re Thorogood,* 22 B.R. 725 (Bankr.E.D.N.Y. 1982); *Evans,* 157 A.2d at 38; 9A *Am.Jur.2d Bankruptcy* § 1617 (1991).

There are several kinds of statutory liens, including mechanics liens, tax liens, rent liens, water/sewer liens, and liens to collect attorney fees. The legislative history of the Code indicates that mechanics' lien can be statutory. *Graffen,* 984 F.2d at 96 (citing H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 314 (1997) *reprinted in* 1978 U.S.C.C.A.N.); *In re Wisner,* 77 B.R. 395, 397–98 (Bankr. N.D.N.Y.1987). *See Evans,* 157 A.2d at 39 (Law Div.1959) (quoting *Bartley v. Smith,* 43 N.J.L. 321 (Sup.Ct.1881)) (mechanics liens are exclusively statutory in origin because "the claim for labor and materials is a property right which does not ripen into an enforceable lien on the land and building until there has been substantial compliance with all the statutory conditions prerequisite.") *See also In re Printcrafters, Inc.* 208 B.R. 968, 976 (Bankr.D.Colo.1997) (attorney liens arise solely by force of a statute upon specified circumstances or conditions, i.e. when attorney has completed compensable work); *In re Ranes,* 31 B.R. 70, 72 (Bankr.D.Colo. 1983) (same). *Cf. Graffen,* 984 F.2d 91 (citing Pa.Stat.Ann. tit. 49 § 1502 (1965)) (water lien was statutory because the docketing was merely a specified condition for the creation of the lien similar to the prerequisites of a mechanics lien); *In re Fennelly,* 212 B.R. 61, 65 (D.N.J.1997) ("mere ministerial act of recording the Department of Motor Vehicle's lien does not create the requisite legal process or proceeding required to be a judicial lien."). *Aikens,* 87 B.R. 350, 352–53 (citing 53 P.S. § 7106(b)) (water and sewer lien was statutory even though the city was required to docket the lien in order to perfect it ...

docketing requirement was to protect the rights of the city against subsequent good-faith purchasers);

A key feature of the "fresh start" policy of the Bankruptcy Code is the avoidance of certain nonconsensual liens on the property of a debtor. Avoidance is commonly accomplished by the trustee of the estate under 11 U.S.C. § 547.[14] Avoidance, however, also may be accomplished by a debtor against any *judicial* liens on a debtor's exempt property under § 522(f)(1).

In pertinent part, § 522(f)(1) provides:

Notwithstanding any waiver of exemptions but subject to paragraph (3), the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—

(A) a *judicial lien,* other than a judicial lien that secures a debt—

(i) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement[.]

11 U.S.C. § 522(f)(1)(A)(i) (emphasis added). The classification of a lien as judicial or statutory therefore is relevant for purposes of section 522(f)(1) avoidance powers because statutory liens cannot be avoided under that section.[15] *Aikens,* 87 B.R. at 352; *In re Thorogood,* 22 B.R. 725 (Bankr.E.D.N.Y. 1982).

---

**14.** Section 547 of the Code allows a Trustee to avoid certain transfers of interest of the debtor's property which are determined to be preferential. Particularly, § 547(b) provides that a trustee could avoid a transfer of interest if it is: "(1) to the benefit of a creditor; (2) for or on account of an antecedent debt; (3) made while the debtor was insolvent (4) made on or within 90 days before the date of the filing of petition ... (5) (transfer) enables such creditor to receive more than such creditor would receive if ... the case were ... under chapter 7 ..."

11 U.S.C. § 547(b) (CBC 1997) (parenthetical added).

**15.** The trustee has the power to avoid statutory liens where the lien "is not perfected or enforceable at the time of the commencement of the case against a bona fide purchaser that purchases such property, whether or not such purchaser exists."

11 U.S.C. § 545(2); *Aikens,* 87 B.R. at 355.

## Survey of Case Law

█ In bankruptcy proceedings, particularly in the context of debtor lien avoidance power under § 522(f)(1), courts must look to state law to determine the validity, nature and effect of liens. *Porter v. Searle,* 228 F.2d 748 (10th Cir.1955); *In re Schreiber,* 194 B.R. 559, 567 (E.D.Pa.1996), *aff'd in part, rev'd in part,* 124 F.3d 188 (3d Cir. 1997); *In re Lewis Energy Corp.,* 36 B.R. 205, 207 (Bkrtcy.D.Col.1983); *In re Spectra Prism Industries, Inc.,* 28 B.R. 397 (Bkrtcy. App.Cal.1983); *In re Computer Room, Inc.,* 24 B.R. 732 (Bkrtcy.Ala.1983).

The Third Circuit in *Ashe* looked to state law to determine the effect and validity of a cognovit note for purposes of debtor avoidance under § 522(f). That court held that the Pennsylvania cognovit note is a judicial lien within the meaning of § 522(f)(1). *Ashe,* 669 F.2d 105 (3d Cir.1982). The court, in determining whether the local statute [16] created a statutory lien, examined the legislative intent of Congress when it drafted the definition of judicial liens and security interests in the Code. The court found that the legislative history of the Bankruptcy Reform Act indicates that Congress did not intend to treat cognovit note liens differently from all other judgment liens. *Id. See In re Fell,* 18 F.Supp. 989, 991 (E.D.Pa.1937); *In re Applebaum,* 162 B.R. 548, 550 (Bankr.E.D.Ca. 1993).

Additionally, the Third Circuit, in *Gardner,* held that a lien held by welfare services that secured a child support debt was a judicial lien under § 522(f)(1). *Gardner,* 685 F.2d at 108. In that case, the Debtor sought to avoid the $19,294.68 lien held by Department of Public Welfare ("DPW"), which represented the total amount the debtor received in public assistance prior to filing bankruptcy.[17] The DPW argued that the holding in *Ashe,* is distinguishable because that case involved a judgment lien arising out of a transaction with a private creditor. Further, DPW argued that § 522(f)(1) was not intended to apply to states. The court held that section 522(f)(1) did apply to the states.[18] The court also held that the reimbursement agreement that created the lien was neither a statutory nor an equitable lien. The court reasoned that the lien was not an equitable lien because of lack of specific identity of the property intended to be subject of the lien. Moreover, the lien was not a statutory lien because there is no lien at all until the cognovit notes were filed with the Prothonotary as judgments. *Id.* at 109. *But see, In re Lekvold,* 18 B.R. 663 (Bankr.D.N.M.1982) (New Mexico statute created statutory lien in favor of former wife on debtor's real estate that secured back payment of child support). *Cf. Graffen* 984 F.2d at 96; (water lien was not judicial because the amount of the lien was administratively determined by Water Department, which did not involve a legal process or proceeding); *In re Phillippy,* 178

16. Pa.Rules Civ.P. 2951(a), 42 Pa. Cons.Stat.Ann. (Purdon 1975).

17. As a condition for receiving public assistance, Debtor was required to sign a reimbursement agreement, Forms PA–9. Each form contains a standard Pennsylvania confession of judgment provision which authorizes entry of judgment. The provision further provides that each judgment shall be a lien upon real property and collected as other judgments. *Gardner,* 685 F.2d at 108.

18. The court points out that § 106(c) of the Code apply notwithstanding any assertion of sovereign immunity by a state or local government. Section 106 provides in pertinent part: any provisions of this title, which contain "creditor" "entity" or "governmental unit" apply to governmental units.... *Id.* at 108 (quoting 11 U.S.C. § 106(c)).

Specifically, DPW contends that section 522(f)(1) does not contain the specific words "creditor", "entity" or "governmental unit" and therefore could not have been intended to apply to the states. However, the court noted that "section 106(c) waives the sovereign immunity of the United States with respect to ... dischargeability of debts owed to federal government ..." The court held, in the context of exemption provisions in § 522, that there was no indication that Congress intended to treat state governmental creditors different from United States creditors. *Id.* (citing S.Rep. No. 989, 95th Cong., 2nd Sess. 76 (1978) and H.R.Rep. No. 595, 95th Cong., 1st Sess. 362 (1977)). The Supreme Court case, *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) expressly overrules section 106(c) of the Code on the grounds that it violates the Eleventh Amendment sovereign immunity of the states. See *supra,* p. 33–34 for discussion of the *Seminole* opinion.

**42**

B.R. 67, 70 (Bankr.M.D.Pa.1994) (court denied debtor's motion to avoid lien under § 522(f)(1) because there was no judgment or administrative process to support the argument that a judicial lien was created by the recordation of the lien); *Ranes*, 31 B.R. at 72 (debtor could not avoid attorney's lien which attached to her claim of spousal maintenance because the lien was statutory, not judicial). *Accord Graffen*, 984 F.2d at 96; *Ransom v. Marrazzo*, 848 F.2d 398, 404 (3d Cir.1988).

Some courts, however, have held that the mere fact that a lien is dependent upon a statute is not determinative of whether such lien is statutory for purposes of the Code. *In re Plumlee*, 100 B.R. 304 (Bankr.D.S.C. 1989). *See In re Underwood*, 103 B.R. 849 (Bankr.E.D.Mich.1989) (a court must consider a lien's origin instead of the means of enforcing the lien to determine the nature of a particular lien). Further, Collier states "[I]t is unlikely that in every instance in which a statute provided that a judgment becomes a lien only upon its docketing or recordation that Congress intended that the lien would be a statutory lien." 4 *Collier on Bankruptcy*, ¶ 7.04[3] at 7–22 (Matthew Bender 15th ed. Revised).

In the instant case, MCDSS asserts that its lien, which secures child support arrearages, is statutory pursuant to N.J.S.A. 2A:17–56.23 *et seq.*[19] As a result, MCDSS contends that its statutory lien for child support arrears cannot be avoided by a debtor under § 522(f)(1). This court must look to state law to determine the validity and effect of MCDSS' lien. *In re Schreiber*, 194 B.R. 559, 567 (E.D.Pa.1996). Accordingly, N.J.S.A. 2A:17–56.23a, "Order or portion of order for child support; enforcement and entitlement to full faith and credit; prohibition of retroactive modification" provides:

> Any payment or installment of an order for child support, or those portions of an order which are allocated for child support, whether ordered in this State or in another

state, shall be fully enforceable and entitled to full faith and credit and *shall be a judgment by operation of law* on and after the date it is due. No payment allocated for child support, or those portions of an order which are allocated for child support established prior to or subsequent to the effective date of P.L.1993, c. 45 (C. 2A:17–56.23.a), shall be retroactively modified by the court....

N.J.S.A. 2A:17–56.23a (West 1986 pocket part) (emphasis added).

MCDSS asserts that the statutory language "judgment by operation of law" creates an automatic statutory lien for child support arrears. MCDSS further argues that its lien is statutory because the process of obtaining a lien, via computer through a system known as the Automated Child Support Enforcement System (hereinafter "ACSES"), is accomplished without any judicial action. Brief Opp. At 2. According to MCDSS, the ACSES system relays the obligor's delinquency electronically to the judgment docketing computer in Trenton. *Id.* By virtue of N.J.S.A. 2A:17–56.23a, the delinquency automatically becomes a judgment against the obligor and a lien on the obligor's real and personal property.

The nature and validity of child support liens have been examined under state law. Specifically, § 23.26.1 Judgment for Child Support, provides: "New Jersey enacted the Child Support Enforcement Act[20] to conform to the federal legislation which mandated that the states had to comply with various federal child support standards as a condition of receiving federal funding for child support arrearages." Celentano, *13A New Jersey Practice* § 23.26.1 *et seq.* As of September 1, 1992, child support judgments searches are conducted electronically via the ACSES system. *Id.* As a result, several court rules were amended to permit the use of ACSES as the Civil Order and Judgment Docket for child support judgments.[21] Initially, the

**19.** Section 2A:17–56.23 is titled "System for Expediting Child Support Cases; Supreme Court Rule". The title suggests that the statute may be intended primarily for enforcement of child support orders. Comments refer to Celentano, *13A New Jersey Practice* § 23–26.1 *et seq.*, wherein there is a discussion of liens on property may be obtained for child support judgments.

**20.** See N.J.S.A. 2A:17–56.23a.

**21.** Under the ACSES system, child support judgments are supposed to be updated daily to reflect

court will issue a docket number. Then, the docket number is entered into the ACSES terminal in order to obtain a judgment amount, filing date, entry date, county of venue and the date of satisfaction. *Id.* The court also provides instructions for use of the terminals, which are available in the Judgment Section of the court.

Other jurisdictions have held, in the absence of a controlling statute, courts have the discretion to determine whether a lien should be awarded to secure payment of child support. *Latterner v. Latterner,* 121 Cal.App. 298, 8 P.2d 870 (1 Dist.1932). Similarly, in this jurisdiction, "past due installments do not vest as they become arrears but are subject to the control of the court." Silberman, *11 New Jersey Practice,* § 1340 Arrears. The court in *Ribner v. Ribner,* 290 N.J.Super. 66, 674 A.2d 1021 (App.Div.1996) held that the *court* has discretion to determine whether the prior support order or judgment should be enforced and whether and to what extent a spouse should be forced to pay the arrears. *Id.* at 1026 quoting *Mastropole v. Mastropole,* 181 N.J.Super. 130, 436 A.2d 955 (App.Div.1981) (emphasis added). *See Winter v. Winter,* 162 N.J.Super. 456, 393 A.2d 593, 595 (App.Div.1978) (alimony and support obligations do not automatically vest as they become arrears but are subject to the control of the court); *Tancredi v. Tancredi,* 101 N.J.Super. 259, 244 A.2d 139, 140 (App.Div.1968) (enforcement, collection, modification of unpaid arrearages for support are *always* addressed to the sound discretion of the court) (emphasis added). *See also, Slep v. Slep,* 43 N.J.Super.

538, 129 A.2d 317, 318 (Ch.1957) (same); *Federbush v. Federbush,* 5 N.J.Super. 107, 68 A.2d 473, 474 (App.Div.1949) (same). Cf. *C v. R.,* 169 N.J.Super. 168, 404 A.2d 366 (Ch. 1979) (a judicially defined right has vested in the children when child support arrears are reduced to judgment).

Additionally, § 23.26.2 of New Jersey Practice, sets forth the procedure for satisfaction of a child support judgment. It should be noted that all satisfactions must be paid through the Probation Division.[22] Any payment sent directly to the child/obligee will not be credited and the judgment will continue to appear on ACSES. Celentano, *13A New Jersey Practice* § 23.26.1 *et seq.* Once the Probation Department receives the payments, it will obtain and file a Warrant of Satisfaction and the ACSES system will be updated to reflect payments. *Id.* It appears that the enforcement of child support arrears also requires judicial action. Section 1339.15 provides that "the methods of enforcement of child support orders are the same for alimony orders" which are enforced through the courts. Silberman, *11 New Jersey Practice* § 1339.15.

### *Analysis:*

■ MCDSS contends that its lien, which secures the child support debt, is statutory by virtue of N.J.S.A. 2A:17–56.23a. However, there is no indication that this lien "arises solely by force of statute on specified circumstances or conditions." 11 U.S.C. § 101(53). This is not the typical situation where the validity and creation of the lien arose without

payments and charges to the account. The court rules provide that child support judgment searches are to be conducted in the Judgment Section of the Office of the Clerk. Obligors are identified by searching the Child Support Judgment Index. The child support judgment docket number can also be located here.

Local Court Rule 4:101–1, Rules Governing Civil Practice, provides that child support judgment orders issued pursuant to N.J.S.A. 2A:17–56.23a, "shall have the same force and effect as entry of an abstract in the Civil Judgment ..." Local Court R. 4:101–1(b). Rule 4:101–1(a) provided for the entry of an abstract. The rule states: ....[t]he Clerk of the Superior Court or ... the deputy clerk of the Superior Court in the county of venue shall enter in the Civil Judgment and Order Docket an abstract of each judgment or order for the payment of money entered in the

Superior Court ... For purposes of this Rule, the Chief Probation Officer is a Superior deputy clerk. See Local Rule 1:34–2.

The abstract must contain the title of the court and names of all parties, the nature of the action and the amount of debt, damages and costs. As for judgments or orders affecting title to or a lien upon real or personal property, a designation of the property affected must be contained in the order.

**22.** Section 23.26.3 states: the Chief Probation Officer will issue, upon request, certification of the amount due. Appendix XIII prescribes the Form for Certification of Child Support Arrears. *See also,* Local Court Rules Governing Civil Practice, 4:101–5 (same).

any legal proceeding or the amount of the lien is administratively determined by statute. *Graffen,* 984 F.2d at 96. Additionally, unlike attorney or mechanics liens, which have been held to be statutory, MCDSS' lien for child support did not arise "solely by statute upon specified circumstances." *Printcrafters,* 208 B.R. at 976; *Evans,* 157 A.2d at 39.

It appears that the ACSES system is analogous to the Pennsylvania confession of judgment system. Similarly, as in *Ashe,* the fact that judgment amounts are entered automatically via computer without "the agency of an attorney or the filing of a complaint" does not mean that the Legislature intended to create a statutory lien. *Ashe,* 669 F.2d at 108. In fact, upon close examination of the ACSES system and related court rules, it appears that prior judicial action or the adjudicatory process is required to effectuate the lien. According to § 23.26.1, the court issues a docket number, which is then entered into the ACSES terminal. It is through this computer system that obligees can obtain information concerning the judgment amount, filing date, entry date, county of venue and the date of satisfaction.

In the instant case, the child support lien is based on prior judicial action. Specifically, MCDSS seeks to enforce two court orders for child support obligations of the Debtor's two children. See Brief Opp. at 1. MCDSS concedes that these orders were entered by the Family Court so that the public assistance monies paid to the children prior to the marriage could be recouped by the state. *Id.* In sum, MCDSS' lien is judicial because the Family Court, not a statute, determines the amount of the lien and arrearages. The purpose of N.J.S.A. 2A:17–56.23a is to create more efficient methods of *enforcing* child support orders and arrears via a computer system. It is through this ACSES system, that information concerning arrears are docketed, instead of filed with the Clerk.

Admittedly, the plain language of N.J.S.A. 2A:17–53.26a, which states that any payment of an order for child support becomes a

"judgment by operation of law" appears to create a lien. However, the New Jersey Practice guidelines and local court rules [23] indicate that N.J.S.A. 2A:17–56.23 *et seq.* was intended to be an enforcement statute. Specifically, the statutory language appears to create a more efficient mechanism of collection and enforcement of child support arrears. Further, there is sufficient case law which indicates that the enforcement, collection and modification of child support arrears are always subject to the control of the court. *Ribner,* 290 N.J.Super. 66, 674 A.2d 1021. On the other hand, there is no case law to support MCDSS' contention that N.J.S.A. 2A:17–56.23 creates an automatic statutory lien for child support arrears.

In fact, the cases which cite this statute only refer to the anti-retroactive language. The anti-retroactive language states that "no payment or installment for . . . child support . . . established prior to or subsequent to the effective date of (statute) shall be retroactively modified by the court. . . ." *See* N.J.S.A. 2A:17–56.23a (parenthetical added). *See also, Bowens v. Bowens,* 286 N.J.Super. 70, 668 A.2d 90 (App.Div.1995) (statute barring anti-retroactive modification of child support awards did not bar elimination of arrears that accrued after the date of child's emancipation); *Mahoney v. Pennell,* 285 N.J.Super. 638, 667 A.2d 1119 (App.Div.1995) (same); *See also, Ryan v. Ryan,* 246 N.J.Super. 376, 587 A.2d 682 (Ch.1990) (equitable factors considered when applying the anti-retroactive statute, especially where child support arrearages accumulated over 15 years with no effort to collect). *Cf. Ohlhoff v. Ohlhoff,* 246 N.J.Super. 1, 586 A.2d 839 (Ch. 1991) (no retroactive application of statute to child support obligations due prior to its enactment).

Based on the foregoing, this Court finds that MCDSS holds a judicial lien which is subject to avoidance by the debtor under § 522(f)(1)(A).

**B. *Assignment of Lien***

 The Code, under the Bankruptcy Reform Act of 1994, now provides for a statu-

---

**23.** *See* Celentano, *13A New Jersey Practice* § 23.26.1 *et seq.;* and § 23.26.2; Silberman, *11 New Jersey Practice* § 1339.15; Local Court

Rules Governing Civil Practice, 4:101–1, 4:101–5, and 1:34–2.

tory exception to lien avoidance in the context of family related liens from support orders or decrees.[24] A debtor may not avoid the fixing of a judicial lien which "secures a debt to a spouse or child of the debtor ... for alimony or support ..." 11 U.S.C. § 522(f)(1)(A)(i). The purpose of this exception is to provide greater protection for alimony or support obligations owed to a spouse, former spouse or child of the debtor in bankruptcy. 4 *Collier on Bankruptcy* ¶ 7.04[3][c], 7–33 (Matthew Bender 15th Ed.Revised). However, there is an exception. Section 522(f)(1)(A)(ii) allows avoidance of those liens:

> (ii) to the extent that such debt—
>
> (I) is not assigned to another entity, voluntarily, by operation of law, or otherwise; and
>
> (II) includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance or support;

MCDSS asserts that New Jersey state law allows for the assignment of debts securing alimony and child support obligations. Specifically, N.J.S.A. 44:10–2, "Persons entitled to financial assistance; administration of assistance; application or receipt of aid to operate as assignment" provides in pertinent part:

> Eligible dependent children living in New Jersey and the parent or parents or relative ... with whom they are living shall be entitled to financial assistance, to be paid for by the county, State and federal governments in accordance with the provisions of section 5 of P.L.1959, (C. 44:10–6), ....
> Additionally, application for or receipt of aid to families with dependent children shall operate as an assignment pursuant to

Titles IV–A and D of the Social Security Act, to the county welfare agency of any rights to support from any other person that the applicant recipient may have on or behalf of any other family member for whom the applying for or receiving assistance ...

Additionally, state practice guidelines and local court rules provide for the assignment of child support judgments.[25] Some cases have held that child support debts or judgments can be assigned. *See New Brunswick Sav. Bank v. Markouski,* 123 N.J. 402, 587 A.2d 1265 (1991) (judgments can be assigned pledged or used as collateral). *See also, Baylor v. New Jersey Dept. of Human Services, Div. of Welfare,* 235 N.J.Super. 22, 561 A.2d 618, 621 (App.Div.1989), *aff'd,* 127 N.J. 286, 604 A.2d 110 (1990) (Title IV–D of the federal Aid to Families with Dependent Children ("AFDC") statute [26] requires the State to designate an agency to administer the state AFDC plan and that plan must provide that the State will undertake to collect assigned child support from legally liable persons); *Dolberry v. Dolberry,* 188 N.J.Super. 265, 457 A.2d 71, 73 (Ch.1982) (assignment of support rights by recipient of AFDC to the state constituted an obligation owed to the county welfare board by former husband for the amount specified in the order for support); *Essex County Welfare Div. v. Simon,* 178 N.J.Super. 523, 429 A.2d 609 (App.Div. 1981) (same). *But see, In re Beverly,* 196 B.R. 128, 132–33 (Bankr.W.D.Mo.1996) (no assignment for purposes of dischargeability under section 523(a)(5) because there was no provision in the child support enforcement statute, like AFDC, which required mother to assign support rights as condition of receiving funds).

---

**24.** Pub.L. No. 103–394 (effective with respect to cases filed on or after October 22, 1994), *reprinted in* Vol. E *Collier on Bankruptcy,* App.Pt. 9(a) (Matthew Bender 15th Ed.Revised).

**25.** Celentano, *13A New Jersey Practice* § 23.27. *See* Local Court Rules governing Civil Practice, 4:101–5(a), which states:
The Clerk of the Superior Court shall enter upon the Civil Judgment and Order Docket ... or other book in which the judgment or lien has been entered, a notation of the filing or lodging with the clerk for record of any assign-

ment of ... any judgment. Such notation shall appear at a discernible place on or at the entry of such judgment in said docket or book. Local Rule 4:101–5(a).

**26.** *See generally,* 42 U.S.C.A. §§ 651–665. Title IV–D of Section 652(a)(1) establishes the federal scheme for state collection of child support for persons receiving AFDC. *Baylor,* 561 A.2d at 621. Section 654(3) and § 644(4)(B) provide for the assignment of the right to support to state agency from legally liable persons. 42 U.S.C.A. §§ 654(3) and (4)(B). Id. at 622.

Further, the state welfare agency is empowered to collect child support even if the custodial parent chooses not to enforce this right. The New Jersey Supreme Court *Pascale v. Pascale*, 140 N.J. 583, 660 A.2d 485 (1995) held that the right of support could not be waived by the custodial parent because the right of support belongs to the child. *Id.* 660 A.2d at 489. *See Martinetti v. Hickman*, 261 N.J.Super. 508, 619 A.2d 599, 600 (App.Div.1993) (same); *Ryan v. Ryan*, 246 N.J.Super. 376, 587 A.2d 682 (Ch.1990) (same). *Cf. Bencivenga v. Bencivenga*, 254 N.J.Super. 328, 603 A.2d 531 (App.Div.1992) (a non-custodial parent who initially did not undertake any of the financial burden of a child may not later escape responsibility).

Similarly, federal courts have held that state welfare agencies have the power to recoup AFDC payments made to obligor's child during the period of non-support. *Matter of Seibert*, 914 F.2d 102 (7th Cir.1990). The Seventh Circuit in *Seibert* held that a father's duty to reimburse the Department of Social Services for medical expenses associated with a pregnancy could not be discharged. *See In re Browning*, 161 B.R. 841 (Bankr. E.D.Cal.1993) (AFDC payments that are made in lieu of the father's support should be repaid and are nondischargeable under section 523(a)(5)); *In re Donelson*, 153 B.R. 995 (Bankr.W.D.Mo.1993) (same).

In this case, it appears that MCDSS' lien, although a lien which secures a child support debt, may be avoidable because it is a lien that "is assigned to another entity by operation of law." 11 U.S.C. § 522(f)(1)(A). The child support debt owed by Debtor was assigned to MCDSS, by virtue of N.J.S.A. 44:10–2, which provides for the assignment of child support debts to state welfare agencies where the obligor's dependent children have received AFDC funds. Further, social welfare agencies are charged with the duty to collect child support obligations from legally liable persons.[27] Accordingly, it appears that the Debtor could avoid MCDSS' child support lien because it was a lien that was assigned by operation of law pursuant to section 522(f)(1)(A)(ii)(I).

■ Arguably, the language of section 522(f)(1) could prevent the avoidance of MCDSS' child support lien, even though it was assigned voluntarily or by operation of law, if such a lien is "a liability [that] is actually in the nature of alimony, maintenance or support." 11 U.S.C. § 522(f)(1)(A)(ii)(II). However, Collier warns "labels of debts as alimony or support are not conclusive and will not protect liens that are labeled as alimony or support, but are in reality securing property settlement debts." 4 *Collier on Bankruptcy* ¶ 7.04[3][c], p. 7–34 (Matthew Bender 15th Ed.Revised). In this case, the MCDSS lien is not actually in the nature of child support because it is attempting to recoup a debt of AFDC payments previously made on behalf of the Christie children.

Analogously, there are cases, in the context of dischargeability under section 523(a)(5), which have held that a claim will be excepted from discharge (or avoidance) if it is actually in the nature of alimony or child support. The court in *Matter of Saafir*, 192 B.R. 964 (Bankr.D.Neb.1996), determined that the judgment held by Kansas Department of Social and Rehabilitation Services ("DSRS") for assistance given to debtor's child, while a ward of the state, was dischargeable. *Id.* at 966. There the court examined the legislative history of section 523(a)(5), which indicates that only debts owed *directly* to a spouse or child are within the meaning of the exceptions to discharge. *Id.* at 968 (citing H.R.Rep. No. 595, 95th Cong.2d Sess. 364 (1978) *reprinted* in 1978 U.S.C.C.A.N. 5963, 6319–6320). Further, Congress intended that the exceptions to discharge should be narrowly construed. *Id.* As a result, the court held that the debt for costs spent in foster care was not the sort of debt Congress intended as an exception to discharge. *Id.*

The court in *Saafir* also examined the decisional case law decided after the Bank-

---

27. *See* Celentano, *13A New Jersey Practice*, § 23.26.3; Local Court Rule Governing Civil Practice, 4:101–5. *See also, Seibert,* 914 F.2d 102 (state welfare agencies have the power to recoup AFDC payments paid in lieu of child support.); *Beverly,* 196 B.R. 128 (same); *Baylor,* 235 N.J.Super. 22, 561 A.2d 618.

ruptcy Reform Act of 1978, which invariably held that discharge of child support obligations assigned to the state was constitutional. *Id.* (citing *In re Glidden*, 653 F.2d 85 (2d Cir.1981), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1003, 71 L.Ed.2d 295 (1982)). Accordingly, the court found that Kansas DSRS did not hold a claim for a child support debt by assignment. *See also, In re Antikainen*, 48 B.R. 630 (Bankr.D.Minn.1985) (debt to pay obligation for social security benefits dischargeable because the debt was not owed directly to spouse or dependent).

This court believes that the instant case is analogous to *Saafir*. Specifically, MCDSS holds its lien, which secures a child support debt, by virtue of an assignment to the state. N.J.S.A. 44:10–2 (West 1987). The case law and legislative history permitting discharge ability under section 523(a)(5) of assigned child support debts is certainly persuasive in the context of avoidance under section 522(f)(1) *et seq. Saafir*, 192 B.R. 964; *In re McDonald*, 31 B.R. 79 (Bankr.D.Neb.1983); *In re Lovett*, 6 B.R. 270 (Bankr.D.Utah 1980). Accordingly, avoidance of MCDSS' lien is proper because the payments are in the nature of an assigned debt and not directly owed to the child. *Antikainen*, 48 B.R. 630.

Even assuming that those cases held that the liens securing assigned child support debts were non-dischargeable, a debtor may still be able to avoid the lien under § 522(f)(1). The Third Circuit in *Walters v. U.S. Nat. Bank in Johnstown*, 879 F.2d 95 (3d Cir.1989) allowed a debtor to avoid a judicial lien on a homestead for a debt which was nondischargeable for fraud under section 523(a)(2)(A). Id. at 96. The court reasoned that there was no legislative history indicating that § 523 was intended to "trump" § 522. Id. at 97. *See In re Liming*, 797 F.2d 895 (10th Cir.1986) (same). Therefore, this court finds that the Debtor can avoid the child support lien held by MCDSS.

### C. *Impairment of Exemption*

Congress enacted section 522(f) with the broad purpose of protecting the debtor's exempt property. *Farrey v. Sanderfoot*, 500 U.S. 291, 297, 111 S.Ct. 1825, 1829, 114 L.Ed.2d 337 (1991). There are three requirements for avoidance of a lien under section 522(f)(1). First, the lien must in fact be a judicial lien. *In re Catli*, 999 F.2d 1405 (9th Cir. BAP 1993); *In re Harville*, 63 B.R. 371 (Bankr.W.D.Ky.1986). In the context of divorce cases, if the divorce gave rise to the creation of the lien, it is considered a judicial lien subject to avoidance under § 522(f)(1). *In re Sanderfoot*, 899 F.2d 598 (7th Cir.1990) *rev'd on other grounds* 500 U.S. 291, 111 S.Ct. 1825, 114 L.Ed.2d 337 (1991) (determination of when lien fixes on debtor's interest).

Second, the lien of a creditor must be against an interest of the debtor in property. Generally, courts will determine at what point the lien fixed on the debtor's interest. The Supreme Court in *Sanderfoot* held that a debtor may not avoid the fixing of a lien if the debtor acquired the property subject to the lien. *Sanderfoot*, 500 U.S. at 297, 111 S.Ct. at 1829. The Court, upon examination of state law, reasoned that the former spouse's judicial lien could not be avoided because the divorce decree simultaneously created the fee simple interest and the lien. *Id.* at 299, 111 S.Ct. at 1830. *See In re Foss*, 200 B.R. 660, 662 (9th Cir. BAP 1996) ([W]hether a lien attached before or after the debtor obtained an interest is a question of state law); *In re Catli*, 999 F.2d 1405 (9th Cir.1993) (same). *See generally, In re Barnes*, 198 B.R. 779 (9th Cir. BAP 1996) (no avoidance under section 522(f) if the divorce gave rise to the creation of the lien); *In re Yerrington*, 144 B.R. 96 (9th Cir. BAP 1992) (same), *aff'd* 19 F.3d 32 (9th Cir.1994); *In re Hilt*, 175 B.R. 747 (Bankr.D.Kan.1994) (same); *In re Haynes*, 157 B.R. 646 (Bankr. S.D.Ind.1992) (same); *In re Warfield*, 157 B.R. 651 (Bankr.S.D.Ind.1993) (same). *But see, In re Wright*, 135 B.R. 871, 872 (Bankr. W.D.Mo.1992) (debtor allowed to avoid former spouse's judicial lien granted in divorce proceeding because property was wholly owned by debtor before the marriage); *In re Byler*, 160 B.R. 178, 180 (Bankr.N.D.Okla. 1993) (same).

Finally, the lien must impair an exemption that the debtor is entitled to under § 522 of the Code. *In re Menell*, 37 F.3d

113 (3d Cir.1994); *In re Finn,* 211 B.R. 780 (1st Cir. BAP 1997); *In re Jones,* 183 B.R. 93, 94 (Bankr.W.D.Pa.1995). The bankruptcy courts have developed a formula that is commonly used to determine when a lien impairs an exemption. The formula for avoidance under § 522(f) contains a three step process used by courts to determine when a lien impairs an exemption. 1) each valid non-judicial lien, in order of priority, must be subtracted from the value of the property; 2) the exemption that is claimed by the debtor must then be subtracted; 3) all judicial liens must be subtracted, which may be avoided to the extent that any or all portions of the judicial lien exceed the remainder left over from step 2. 11 U.S.C. § 522(f)(2)(A). *In re Corson,* 206 B.R. 17 (Bankr.Conn.1997). *Cf. In re Witkowski,* 176 B.R. 114 (Bankr.D.Mass.1994) (rule preventing lien stripping in chapter 7 cases is not applicable to lien avoidance process under § 522(f)).

Most courts, however, focus on one or more elements to determine if the debtor is entitled to lien avoidance under the Code. *See* Suzanne E. Doherty, *"The Interplay between Bankruptcy and Divorce: Which Former Spouse Deserves the Fresh Start?",* 99 Com.L.J. 192, 197 (1994). In this case, Debtors can avoid MCDSS' lien because it is a judicial lien which impairs the homestead exemption that the debtor is entitled to pursuant to section 522(d)(1) of the Code. There is no sufficient evidence in the instant case which indicates exactly what point the Debtors interest may have fixed in the property before MCDSS perfected its lien. Nonetheless, the facts indicate that MCDSS does hold a judicial lien which is subject to avoidance under § 522(f)(1). Furthermore, it appears that MCDSS' judicial lien impairs the Debtors' exemption under the formula set forth above.[28]

---

**28.** Debtors could avoid MCDSS' lien under the following formula:
1) each valid nonjudicial lien, (Ford Consumer purchase money mortgage) $50,542.61 **subtracted** from the value of the property $69,000 (Ex. A, B to Cert.Supp.) = $18,458.61
2) Then, the exemption $30,000 is **subtracted** from $18,458.61 = -$11,541.39
3) Next, all judicial liens (including the MCDSS lien) $14,130.11 must be **subtracted** from the

## Conclusion

Based on the forgoing, Debtors' motion to avoid MCDSS' judicial lien, which secures a child support debt, is granted. Accordingly, MCDSS' judicial lien can be avoided under § 522(f)(1) because it impairs the Debtors' homestead exemption under § 522(d)(1).

Debtors should submit an order in accordance with this opinion within ten (10) days.

amount in step 2. Since, there is no remaining equity in the property after the deduction of all non-avoidable mortgages and debtor's exemption, judicial liens may be avoided in its entirety under section 522(f)(1). *In re Cross,* 164 B.R. 496 (Bankr.E.D.Pa.1994). As a result, MCDSS now holds an unsecured claim to the extent that the judicial lien is avoided. *In re Windfelder,* 82 B.R. 367 (Bankr.E.D.Pa.1988); 9A *Am.Jur.2d Bankruptcy* § 1224 (1991).